No. 93,489

STATE OF KANSAS, *Appellee*, v. DEWEY A. GAITHER, *Appellant*.

(156 P.3d 602)

Opinion filed April 27, 2007.

*Sarah Ellen Johnson*, of Kansas Appellate Defender Office, of Topeka, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: Dewey Gaither appeals his convictions and sentences for attempted first-degree premeditated murder; first-degree felony murder; aggravated robbery; aggravated kidnapping; and fel-

ony obstruction of official duty. Gaither asserts that his convictions should be reversed and his sentences vacated because of the following errors: (1) the district court denied his right to a fair trial by committing misconduct during jury voir dire; (2) the district court erroneously denied his motion to sever the charges against him into separate trials; (3) the district court erroneously excluded evidence that one of the victims had a warrant for a federal weapons violation; (4) the district court erroneously admitted evidence in violation of K.S.A. 60-455; (5) the district court erroneously instructed the jury regarding the 60-455 evidence; (6) the district court should have instructed the jury to consider aggravated battery as a lesser included offense to attempted first-degree premeditated murder; (7) the district court committed cumulative errors that denied him a fair trial; and (8) his sentence was erroneously based on his criminal history score, which was not proven beyond a reasonable doubt to the jury.

## FACTS

The convictions in this case stem from Gaither's violent crusade to acquire illegal drugs. On or about July 16, 2003, Gaither went to Eddie Howard's house to buy drugs. Robert Barnes, a friend of Howard's who sold drugs at Howard's house, told Gaither that he did not have what Gaither wanted and advised Gaither to try again later. Gaither returned to Howard's house the following day while Barnes was gone. Leo Holloman, another one of Howard's friends, was sleeping on Howard's sofa when Gaither arrived. Gaither woke Holloman, pointed a 9 mm pistol at his head, and demanded Holloman's money. Before leaving, Gaither told Holloman to warn Barnes that Gaither would be back to get him. When Barnes returned to Howard's house, Holloman told him that Gaither would be back the next morning at 8.

Early the next morning, Gaither returned to Howard's house with his mother, Lenita DeGrate. DeGrate entered the house and spoke briefly to Holloman and Howard while Gaither remained outside on the porch. As Holloman opened the door to let DeGrate out, Gaither approached the door with a gun. When Holloman refused to let Gaither in, Gaither kicked in the glass storm door

and burst into the house. Holloman warned Barnes as he ran out the front door yelling, "There go that nigger again."

Gaither immediately confronted Barnes, pointing a 9 mm pistol at Barnes' head and stating, "I'm going to kill you." Barnes struggled with Gaither, while Gaither's mother repeatedly hit Barnes on the head with a hard object, saying, "Get off my son." Shortly thereafter, Gaither's mother left through the front door. Barnes got away from Gaither and ran out the back door. Barnes then ran around to the sidewalk in front of the house to await the arrival of police. While Barnes was on the front sidewalk, Gaither exited the front door, pointed the pistol at Barnes, cocked it, and fired one shot into Barnes' chest. Gaither then walked across the street, entered the car where his mother was waiting, and drove away.

Police later found an unspent 9 mm cartridge on Howard's front porch. Police also found drops of blood matching DeGrate's DNA on Howard's front steps and sidewalk and on the street in front of Howard's house.

While Barnes was recovering in the hospital, a police officer showed him a photographic lineup. Barnes identified someone other than Gaither as the shooter, stating that he was 70% certain of his identification. Several months later, police presented photographic lineups to Holloman who identified Gaither as the shooter and DeGrate as Gaither's companion.

Four days after shooting Barnes, Gaither was smoking cocaine with his friends, Shannon Doggett and Raina Islas. When the trio ran out of cocaine, Gaither stated that Bobby Washington owed him money and suggested going to Washington's house to collect the debt so they could purchase more drugs. Doggett drove Gaither to Washington's house. Gaither approached Washington's house alone, while Doggett and Islas waited in the truck.

Washington was home with his friend Stephanie Pounds when Gaither arrived. Gaither entered Washington's house and threatened Washington with a gun, demanding money or drugs. While Gaither was attempting to rob Washington, Kevin Phelps knocked at the back door. Gaither instructed Pounds to open the door. As soon as Phelps entered, Gaither demanded Phelps' money. Phelps

initially thought Gaither was joking but quickly realized that he had walked into an armed robbery. Gaither reached into Phelps' pocket and took the $10 bill that Phelps had with him. Gaither was agitated when Washington failed to produce any money or drugs, so Pounds offered to go to the neighbors in search of drugs for Gaither. Gaither agreed to let Pounds go, but threatened to shoot Washington if Pounds did not return.

After Pounds had been gone for several minutes, Gaither told Phelps to go to the back door and look for Pounds. Phelps opened the door, thinking he would be able to run. Gaither, however, grabbed Phelps' shoulder and pointed the gun at Phelps' head. When Phelps and Gaither did not see Pounds, they went back into Washington's house. As soon as Phelps closed the door, Washington threw an oxygen bottle across the room at Gaither. Gaither shot Washington once in the chest, killing him. Phelps ran out the front door, and Gaither followed him.

As soon as Doggett heard the gunshots, she became frightened and started driving away from Washington's house. Doggett saw Gaither run out of Washington's front door towards the neighbor's house, carrying a gun. As Doggett drove by, she yelled at Gaither to get in the truck. Gaither got in, and Doggett drove away. Gaither told Doggett that he had shot the gun in the air to frighten Washington.

Two days later, Doggett heard that Washington had been shot and contacted the police to turn herself in. Doggett informed the police that Gaither had killed Washington with a 9 mm weapon. She also provided a description of Gaither and his vehicle.

The day after Doggett turned herself in, police received a call from the manager of the Holiday Inn reporting some suspicious individuals in the parking lot. Officers responded and found a car in the parking lot occupied by two black males. The driver identified himself as Chesster R. Ridge. The passenger, who was later identified as Gaither, identified himself as Tyrone DeGrate. The officer recognized tattoos on Gaither which matched those of the suspect in the Washington shooting. As the officer started to handcuff him, Gaither fled into the lobby of the Holiday Inn.

Inside the Holiday Inn, Gaither saw a housekeeper cleaning room 109. He pushed her into the room and closed the door. When the housekeeper attempted to use the telephone in the room, Gaither instructed her not to make any calls. While Gaither was getting a drink at the sink, she started to use her cell phone, but Gaither stopped her and took the phone away from her. Gaither returned the phone to the housekeeper, but she did not attempt to make another call. After waiting several minutes, the housekeeper opened the curtains and told Gaither that the police were gone. When Gaither went to the window to look for himself, she ran out of the room and informed police of Gaither's location. Gaither opened the first-floor window and jumped out. Police apprehended Gaither in the Holiday Inn parking lot and transported him to the jail.

Barnes was released from the hospital on the same day that Gaither was arrested. Due to an outstanding warrant, Barnes was arrested and transported to the jail. As Barnes was being fingerprinted at the jail, he saw Gaither and recognized him as the man who had shot him 1 week earlier. Barnes immediately pointed at Gaither and exclaimed, "That's the pussy that shot me."

The State charged Gaither with attempted first-degree premeditated murder for shooting Barnes; felony murder for killing Washington; aggravated robbery for taking money from Phelps at gunpoint; aggravated kidnapping for confining the housekeeper at the Holiday Inn; and felony obstruction of justice for fleeing the police at the Holiday Inn. Gaither filed a motion seeking the severance of his charges; however, the district court denied the motion. Gaither also moved to admit evidence that the Federal Bureau of Alcohol, Tobacco and Firearms (ATF) had a warrant for Barnes' arrest on a weapons violation, and the district court denied that motion.

During voir dire, the district judge became frustrated and angry with two prospective jurors, resulting in her losing her temper and yelling at them. One of the prospective jurors stated that she did not believe police officers could be truthful. After dismissing the woman from jury service, the judge ordered her to appear in court every day to watch the trial. Another prospective juror stated that

her religion prevented her from judging Gaither. However, the prospective juror further stated that she believed Gaither must be guilty of something because he was being tried. The judge dismissed the prospective juror for cause, stating, "I feel sorry for the next person that ends up going, because I am going to hit the roof, I think."

Gaither moved for a mistrial. The State agreed that the judge's comments may have had a chilling effect on the jury. Nevertheless, the judge denied Gaither's motion for a mistrial. The following day, the judge apologized to the jury panel, released the prospective juror from the order to attend trial, and offered to excuse anyone who felt intimidated by her behavior. After two prospective jurors accepted the judge's offer, voir dire continued and the attorneys selected a jury. The jury ultimately found Gaither guilty on all counts.

The district court sentenced Gaither to serve life (hard 20) for felony murder; 203 months for attempted first-degree premeditated murder; 61 months for aggravated robbery; 165 months for aggravated kidnapping; and 7 months for felony obstruction of justice. The district court ordered all of the sentences to be served consecutively, resulting in a life sentence plus 436 months. Gaither now appeals his convictions and his sentences directly to this court pursuant to K.S.A. 22-3601(b)(1).

## ANALYSIS

### Judicial Misconduct

Gaither asserts that the district judge committed misconduct during voir dire when she harshly questioned prospective jurors, lost her temper, and yelled at members of the jury venire. Gaither's complaint stems from the judge's questioning of a prospective juror who indicated that she would not believe anything the police said. The following colloquy is the basis for Gaither's complaint:

"THE COURT: No one's asking the life history and the things that bring you to this place, but that's not what you started out saying, ma'am. What you started saying is, because someone has a uniform on, you will dislike them automatically, and you're going to discount their testimony; is that what you're saying?

"PROSPECTIVE JUROR [L]: When I got my driver's license —

"THE COURT: Answer me yes or no.

"PROSPECTIVE JUROR [L]: Yes. I have to really go and think about that a whole lot. I can't just take their word.

"THE COURT: I'm going to excuse you from your jury service, ma'am, but I'm going to require you to sit through this entire trial, so you can get an objective view of how people—of how people do testify. I think that you have—I think there is perhaps some validity to what you have to say, but I think that you—you need an opportunity to be exposed more to our law enforcement personnel, and I think that because this trial will have so many that will be testifying, I want you to—I'm ordering you to sit through this entire trial. It will be considered part of your jury service, and you will be paid at the rate of a jury member. You'll need to take your card back down.

. . . .

"PROSPECTIVE JUROR [L]: Okay.

"THE COURT: If you fail to appear on any day of the trial, that will be considered contempt of court, because this is a direct order."

After dismissing Prospective Juror L from serving on the jury and ordering her to attend the trial, the judge called Prospective Juror D from the jury pool. Then, the judge stated:

"All right. Anybody else want to mess with me? Just thought I would ask. If anybody doubts how much I value you as jurors and how much—how important I think your service is, I think you get the right idea now. Not one person here is more important than anybody else as far as their time. I really mean it. Thank you."

After this comment, the prosecutor began questioning Prospective Juror D, who stated that her religious beliefs made it uncomfortable for her to judge anyone. Prospective Juror D further advised the court that she believed anyone on trial must be guilty of something. In response to Prospective Juror D's statements, the judge made the following comments:

"I think what you're saying—you're contradicting yourself about what you're saying, and we have had Jehovah's witnesses that do sit on juries. I believe it's your personal feelings that you simply don't want to do it, not because it's a long trial, but I believe you don't want to do it. I've got quite a few people that don't want to do it either. But you have said the magic words, so you are released from your jury service. And I feel sorry for the next person that ends up going, because I am going to hit the roof, I think.

. . . .

"[Prospective Juror D] made a comment which is completely wrong. Just because Mr. Gaither is here does not mean he must be guilty of something. That is the antithesis, the opposite of what our judicial system is about.

"Mr. Gaither sits before each and every one of you right now, and he is innocent until there has been evidence sufficient to what I will instruct the jury on to prove him guilty, and that's beyond a reasonable doubt. . . . Nobody here has heard one piece of evidence about anything, and despite what [Prospective Juror D] said in her misguided beliefs about not judging people, that was absolutely wrong. He sits here an innocent man until evidence has been presented—until and if evidence has been presented sufficient to prove that he's guilty. Does everyone here understand that? If you do not understand that, raise your hand right now. I am vehemently serious about that."

After Prospective Juror D was dismissed for cause, the voir dire continued and the prosecutor addressed Prospective Juror M, who had raised his hand in response to a question about contact with law enforcement officers. Prospective Juror M stated that he had changed his mind about responding to the prosecutor's question. At that point, Gaither's counsel asked to approach the bench. Following an off-the-record bench conference, the judge made the following comments to the jury:

"THE COURT: No one should be compelled—feel compelled to say anything that's not true, because they're afraid I'm going to yell at them. I haven't refused to let anybody off this jury who had a legitimate reason for being off this jury. I became angry with one juror who is going to come back and sit, because I believed that she had an agenda from the minute she walked in here to begin her jury service, based on things that I have observed about her sitting here.

"I was not happy with Prospective Juror D. I will tell you that, because I was not happy that she sat here and announced to a room full of people that she would not judge people, and yet, she turned around and said she believed Mr. Gaither was guilty of something just because he was sitting here. I didn't think that was right either.

"If you have a legitimate reason for not serving on this jury, if you have qualms about anything, I really—you know, I hope that I have not done anything to make you think I'm going to make the rest of you sit through the entire jury trial just because I don't like your answers. I can understand your concerns, and I'll tell you what: The next two people that have things negative to say, I give them amnesty right here ahead of time, all right? I'm really not that bad. I am really not that bad at all, and I want—and you all took an oath, and you must be honest in your answers. I presume that if you have something that's kind of not good, that I'm not going to like that you have the guts to say it because you're under

oath. I've let everybody go except for one person who will be coming back, and I'm quite sure her circumstances were completely unique."

The prosecutor resumed his voir dire without further incident. At the end of the day, the judge recessed voir dire with the following comments:

"Don't talk about this case. Don't think about it. If I have been rude and mean today, I apologize very, very, very much so. I just believe that each one of you is as important as the others, and your time and everything else is as important, and I get a little bit abrupt at times, and I will be good tomorrow, if you all come in and you're nice tomorrow, too, okay?"

After the jury venire left, Gaither's counsel requested a mistrial, stating that the judge's comments had caused a chilling effect on the jury, preventing them from speaking honestly about their feelings and making them fear upsetting the court. The State agreed with Gaither's concern that the judge's comments may have prevented the jury from responding honestly but acknowledged that the jurors appeared to be giving honest responses to his questions. The judge admitted being angry and yelling at two of the prospective jurors and thanked counsel for reining her in. Nevertheless, the judge denied Gaither's request for a mistrial.

The next morning, the judge greeted the jury venire with the following comments:

"Well, I want to talk to you for a few minutes before we get started back on voir dire. I was pretty upset yesterday afternoon with two particular jurors, and it was obvious, and this morning I brought [Prospective Juror L] in, and we had a nice talk this morning, and I understand a little bit more about her position. I probably misunderstood it to some degree. I'm anything but perfect, and I did feel she came in with an agenda, and after talking with her this morning, I'm convinced that she did not have an agenda. And I have decided to let her go, and you all saw that this morning, and that's why I brought her in here.

"I also was not happy with [Prospective Juror D], and I want to make it very clear to all of the jurors here that I do not in any way, shape or fashion presume to judge anyone based on their religion, and my comments had nothing to do with her religion. We have had many Jehovah's witnesses in the over 200 trials that I've had that I have released, quite frankly, without any problem at all. We've had Jehovah's witnesses that have served on juries. That's why I inquired into her beliefs to see where it came from. The reason I released her actually had nothing to do with her religious beliefs, but because of the fact she clearly had a bias sitting here and had prejudged the case or had prejudged Mr. Gaither based on nothing

she had heard in this courtroom, and that's one of the things that I try to make very clear to people, is that I try to make very clear to people, is that you only learn—you can only make decisions on the facts and the law. I was probably too cranky yesterday afternoon, I'm not sure why, but I was probably too cranky.

"My guess is that the reason I was a little cranky yesterday is that I'm looking at a room full of about 60 people who don't want to be here any more than anybody else does, and I see you're basically trying very hard to be pleasant about the prospect of spending two weeks in trial here. I also—I believe that other than military service, and we have a number of people who have done military service, jury duty is one of the most pure forms of service in your community that you can do. You know, especially in this time in our country, we're seeing people who don't just miss out on their job for a week or two because of jury duty. They're missing out on their jobs and families so they can serve their country through their military service, and I think about the sacrifices that people make in order to make this a better place for us to live, and I'm just supremely grateful for that, and I know that it might seem silly to some of you that jury service is like that as well, but that is what jury service is. We're making this community better. We're making this a place where we can have people that will come in, listen to facts and decide a case based on the law and the facts.

"I hope that none of you ever need to appear as a party in court, but if you do, I hope that you have the benefit or you realize the great benefit you have that people are willing to come in and perform their service as jurors. So if I have misled any of you into thinking that I am some angry shrew up here, I am not. I really and truly am not, and if any of you believe for one single minute that you are not free to say what is true in answer to the lawyer's questions, please raise your hand right now, and I will let you go. That is a promise to you. If you feel too intimidated to answer the lawyers' questions honestly, raise your hand right now, and you've just got a free pass out of here, and I won't berate you. I won't be mad. I will be mad only at myself for having caused this environment that you would feel that way, so this is your opportunity. Anybody want to leave?"

Two venire members accepted the judge's offer to leave without questions. Afterwards, the voir dire continued without further incident until the jury was selected.

Gaither characterizes the judge's comments regarding Prospective Juror L as a "diatribe" against a prospective juror in defense of police officers. Gaither argues that he was prejudiced by the judge's conduct because the judge's comments bolstered the credibility of police officers.

An appellate court reviews a claim of judicial misconduct using an unlimited standard. An appellate court must determine the merits of an allegation of judicial misconduct by considering the par-

ticular facts and circumstances surrounding the allegation. Judicial misconduct warrants a new trial if it affirmatively appears that the conduct prejudiced the substantial rights of the complaining party. The party asserting judicial misconduct bears the burden of showing prejudice. *State v. Hayden*, 281 Kan. 112, 116, 130 P.3d 24 (2006). If the judge's comments can be construed properly and reasonably, rendering them unobjectionable, the remarks will not be regarded as prejudicial. *State v. Patton*, 280 Kan. 146, 182, 120 P.3d 760 (2005).

The judicial canons require a judge to perform the duties of the judicial office with impartiality. Canon 3 (2006 Kan. Ct. R. Annot. 572). The expectations for judicial conduct stated in Canon 3 have been summarized as follows in *State v. Miller*, 274 Kan. 113, 128, 49 P.3d 458 (2002):

"The judge should be the exemplar of dignity and impartiality, should exercise restraint over judicial conduct and utterances, should suppress personal predilections, and should control his or her temper and emotions. The judge should not permit any person in the courtroom to embroil him or her in conflict and should avoid conduct which tends to demean the proceedings or to undermine the judge's authority in the courtroom."

We recently reversed a defendant's convictions for second-degree murder, attempted second-degree murder, and aggravated battery because the district judge had polluted the defendant's trial with pervasive misconduct. See *Hayden*, 281 Kan. at 126. The district judge frequently interrupted the examination of witnesses, treated the parties and witnesses rudely and impatiently, failed to remain attentive to the proceedings, and exhibited open hostility toward counsel for both the prosecution and the defense. Noting that the judge's misconduct was not limited to an isolated incident, we commented that the judge had blatantly disregarded the admonition for judges to be sensitive to the grave responsibilities of the courtroom. *Hayden*, 281 Kan. at 126. In *Hayden*, the district judge violated the mandate of *Miller* by disregarding his duty to exercise restraint over his judicial conduct and utterances, refusing to control his temper and emotions, and exhibiting conduct that demeaned the proceedings. See *Miller*, 274 Kan. at 128.

We also reversed a defendant's convictions for rape and aggravated criminal sodomy based on comments made by the district judge during jury orientation because the comments impugned the defendant's credibility. *State v. Plunkett*, 257 Kan. 135, 139, 891 P.2d 370 (1995). The district judge implied that he was suspicious of defense attorneys because they always sat at the table farthest from the bench. The judge further demeaned defense counsel by praising the prosecutor's skills without acknowledging defense counsel's skills. In addition, the judge indicated that he knew secret, derogatory information about the defense counsel. Besides the improper comments during voir dire, the district judge interrupted defense counsel's opening statement, questioned a witness in such a manner as to identify and emphasize the State's theory of guilt, interjected an unwarranted comment during the cross-examination of the complaining witnesses, and stated that defense counsel was objecting for personal rather than legal reasons. Further impugning the defendant's credibility, the judge sent the jury to deliberate, stating that the jury would have to carry out its unpleasant burden just like the court would have to carry out its final obligation in the case, implying that the jury would find the defendant guilty. The *Plunkett* court was especially concerned with the judge's conduct that attacked the defendant's credibility but considered the entire record in determining that the misconduct was reversible. 257 Kan. at 139, 143. The district judge in *Plunkett* violated the mandate of *Miller* by demonstrating his partiality for the State and failing to suppress his predilections. See *Miller*, 274 Kan. at 128.

Like the district judges in *Hayden* and *Plunkett*, the district judge in this case violated the mandate of *Miller*. She failed to control her temper and frustrations, declined to exercise control over her conduct and utterances, and allowed prospective jurors to embroil her in conflict. See *Miller*, 274 Kan. at 128. Consequently, we conclude that her comments constitute judicial misconduct. However, the judicial misconduct in this case is also distinguishable from that in both *Hayden* and *Plunkett*, where the misconduct polluted the entire trial. The district judge in this case regained control over her temper, emotions, conduct, and utter-

ances after the first day of the voir dire. She apologized to the jury venire and offered to excuse anyone who felt intimidated. The judge's sincerity was evident when two prospective jurors accepted her offer and were excused without further questions. We believe the judge's apology and offer to excuse prospective jurors purged the taint of the misconduct. From our review of the entire record, it does not appear that the judge's misconduct prejudiced Gaither's substantial rights.

*Severance*

Gaither claims that the district court improperly joined the charges against him into one complaint and one trial. Gaither raises three arguments. First, he argues that the joinder violated K.S.A. 22-3202(1). Second, Gaither asserts that the joinder denied him a fair trial by confusing the jury and precluding him from testifying. Third, Gaither contends that the improper joinder allowed the State to circumvent K.S.A. 60-455 and rely on propensity evidence.

The standard of review for severance issues has been abuse of discretion. *State v. Bunyard*, 281 Kan. 392, 403, 133 P.3d 14 (2006). However, we believe this standard oversimplifies the analysis for reviewing severance issues. The joining of charges into a single complaint is controlled by statute. As a result, we must begin our analysis with the language of the statute.

K.S.A. 22-3202(1) authorizes the State to charge multiple crimes as separate counts in one complaint, providing:

"(1) Two or more crimes *may* be charged against a defendant in the same complaint, information or indictment in a separate count for each crime *if* the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." (Emphasis added.)

The application of K.S.A. 22-3202(1) is dependent on one of three conditions precedent. The district court must first determine whether any of the conditions precedent apply before exercising its discretion in allowing joinder. The district court's legal conclusion regarding the application of one of the conditions precedent is dependent on the facts of the case. Thus, the district court's

factual findings are given deference. *State v. Harris,* 279 Kan. 163, 167, 105 P.3d 1258 (2005) (stating that an appellate court does not reweigh the evidence or pass on the credibility of witnesses but gives deference to the trial court's factual findings). However, the determination of which condition precedent applies is a legal conclusion subject to de novo review. *State v. Gunby,* 282 Kan. 39, 47-48, 144 P.3d 647 (2006) (stating that when the issue involves the adequacy of the legal basis for the district court's decision, the issue is reviewed using a de novo standard). After the district court makes a legal determination regarding whether one of the conditions precedent apply, K.S.A. 22-3202(1) gives it discretion to decide whether or not to join the charges. An appellate court reviews the final decision to join the charges using an abuse of discretion standard. *State v. Bunyard,* 281 Kan. 392, 403, 133 P.3d 14 (2006). The following summarizes the proper structure for analyzing a district court's decision on the issue of joinder:

I.  Determine which of the three conditions precedent the district court relied on:
    a. same or similar character;
    b. same act or transaction; or
    c. two or more acts or transactions connected together or constituting parts of a common scheme or plan.
II. Determine whether there is substantial competent evidence to support the district court's findings of fact, using a deferential standard;
III. Determine whether the district court properly concluded that a condition precedent had been met, using a de novo standard; and
IV. Determine whether the district court abused its discretion in allowing joinder.

For his first argument, Gaither contends that the joinder of the charges violated K.S.A. 22-3202(1). The district court relied on the "same or similar character" language in K.S.A. 22-3202(1) as the basis for joining the charges against Gaither. The State asserted that crack cocaine was the central theme underlying the commission of all of the crimes. Without making any factual findings, the district court denied Gaither's motion to sever. We note that

Gaither has not objected to the district court's lack of factual findings. When a party fails to object to the lack of findings before the district court, an appellate court presumes that the district court made the factual findings necessary to support its decision. See *In re Care & Treatment of Hay*, 263 Kan. 822, 835, 953 P.2d 666 (1998). Thus, we can proceed directly to the legal conclusion regarding whether the crimes in this case were of the same or similar character without addressing whether the factual findings are supported by substantial competent evidence.

In *State v. Barksdale*, 266 Kan. 498, 510, 973 P.2d 165 (1999), this court upheld the defendant's convictions on two counts of murder, concluding that there was no abuse of discretion in joining the two counts into one trial. Both murders remained unsolved for nearly 2 years until a jailhouse informant advised police that Barksdale had confessed to both murders. Barksdale argued that the facts of each murder were significantly different. The first victim, Hosea Davis, was a friend of the defendant's. Davis was found naked on his dining room floor with telephone cord wrapped around his neck. He died from a skull fracture caused by blunt force trauma. Semen indicated that Davis had engaged in sex with his assailant. The second victim, Jennifer Forgie, was a stranger to the defendant. Forgie was killed at the dry cleaning business where she worked. Forgie's death resulted from a blunt trauma injury to her head, strangulation, and multiple stab wounds to her head and body. Forgie had not been sexually assaulted prior to her death. In addition to arguing that the crimes were factually distinct, the defendant argued that each murder required different evidence with only one witness testifying about both murders.

Contrary to Barksdale's argument, the *Barksdale* court concluded that the murders were sufficiently factually similar to warrant joinder pursuant to K.S.A. 22-3202(1) because both murders were caused to facilitate robbery, both victims were killed in a substantially similar manner, both victims were found face down and tied with cords, and both murders were committed in the same neighborhood within a 9-month period. Although only one witness testified about both charges, the cases required the same mode of

trial, the same kind of evidence, and the same kind of punishment. 266 Kan. at 508-09.

Our comparison of the facts in this case with the facts in *Barksdale* leads us to conclude that the charges are of the same or similar character. The attempted murder of Barnes and the murder of Washington bear more similarity than the murders in *Barksdale*. Both of the victims in this case were drug dealers. Both of the shootings involved Gaither's quest for drugs. Both of the victims were shot in the chest with a 9 mm handgun, and both shootings occurred at private dwellings within a 5-day time period. Like the *Barksdale* case, only one witness testified about both shootings in this case. Nevertheless, both of Gaither's charges involved the same mode of trial, the same kind of evidence, and the same kind of punishment. Thus, we find no merit in Gaither's first argument that the joinder violated K.S.A. 22-3202(1) because the charges are not of the same or similar character.

Now that we have concluded that the district court properly applied the condition precedent in K.S.A. 22-3202(1), we must address Gaither's remaining arguments to determine whether the district court abused its discretion in denying Gaither's motion to sever. For his second argument, Gaither asserts that joining the attempted murder and felony-murder charges denied him a fair trial by confusing the jury and violating his right to testify about some but not all of the charges. The *Barksdale* court rejected the argument regarding jury confusion, noting that the jurors were instructed to consider each charge "separately on the evidence and law applicable to it; uninfluenced by [their] decision as to any other charge." *Barksdale*, 266 Kan. at 510. The jury in this case received the same instruction, and the court can presume that the jury complied with the instruction. See *State v. Donaldson*, 279 Kan. 694, 700, 112 P.3d 99 (2005). Consequently, Gaither's claim of jury confusion does not warrant the severance of the charges against him.

Gaither asserts that he would have testified about the incident at the Holiday Inn, but he did not want to testify regarding the attempted murder charge or the felony-murder charge. Gaither's assertion, however, does not advance his argument. Gaither's sev-

erance argument is limited to the dissimilarity of the felony-murder and attempted murder charges. He raises no argument regarding the joinder of the aggravated kidnapping and felony obstruction of justice charges with the other charges. Consequently, Gaither's assertion that he would testify about the aggravated kidnapping and felony obstruction charges does not support his argument that the felony-murder and attempted murder charges should have been severed. He has failed to demonstrate any special circumstances to support his claim that severance is mandated by his inability to testify regarding the events at the Holiday Inn.

Finally, Gaither claims that the district court should have severed the attempted murder and felony-murder charges because the joint trial allowed the State to rely on his propensity to commit crime in violation of K.S.A. 60-455. Barksdale asserted a similar argument, claiming that the court should adopt a new test for joining charges based on whether the evidence of the separate crimes would be admissible pursuant to K.S.A. 60-455. The *Barksdale* court declined to adopt such a limiting test, stating: "Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455." 266 Kan. at 510. We agree with the *Barksdale* court. Applying the limitations of K.S.A. 60-455 to the joinder of charges would effectively nullify the application of K.S.A. 22-3202(1) when the crimes charged are of the same of similar character. We must assume that the legislature did not enact useless or meaningless legislation. *State v. Deffebaugh*, 277 Kan. 720, 722, 89 P.3d 582 (2004).

A district court abuses its discretion when no reasonable person would adopt the view taken by the court. Thus, the defendant has a heavy burden to establish reversible error once the court concludes that one of the conditions precedent set forth in K.S.A. 22-3202(1) is met. Gaither has failed to carry his burden in this case. The district court did not err when it denied Gaither's motion to sever.

*Admission of the ATF Warrant for Barnes*

Gaither argues that the district court prevented him from presenting evidence to support his theory of defense when it denied his motion to admit evidence of an ATF arrest warrant for Barnes. According to Gaither, the ATF warrant provided the jury with an alternate explanation for the 9 mm cartridge found on Howard's front porch.

"A defendant is entitled to present his or her theory of defense. The exclusion of relevant, admissible, and noncumulative evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right to a fair trial. However, the defendant's right to present a defense is limited by the statutory rules of evidence and the case law interpreting those rules. [Citation omitted.]" *State v. Baker*, 281 Kan. 997, 1008, 135 P.3d 1098 (2006).

When considering the admission or exclusion of evidence, a court must first consider whether the evidence is relevant to prove any material fact. *Baker*, 281 Kan. at 1008. Generally, all relevant evidence is admissible unless specifically excluded by statute. K.S.A. 60-407(f). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b).

Gaither's defense was a general denial. Highlighting the lack of physical evidence linking him to the scene of Barnes' shooting, Gaither claimed that he was not present when Barnes was shot. Under Gaither's theory, it was unnecessary to provide an alternative explanation for the presence of a 9 mm cartridge. If the jury had believed that Gaither was not present when Barnes was shot, it could have inferred that the cartridge was left by the unidentified person who shot Barnes. If the jury believed the State's witnesses, who identified Gaither as the shooter, the possibility that Barnes left the cartridge on the porch does not bolster Gaither's defense. Therefore, the evidence was not relevant to any material facts, and the district court properly excluded it.

*K.S.A. 60-455 Evidence*

Gaither argues that the district court should not have admitted Holloman's testimony regarding the aggravated robbery that occurred the day before Barnes was shot. Gaither asserts that the evidence was admitted in violation of K.S.A. 60-455. However,

Gaither failed to object to the admission of the evidence and preserve the issue for appeal. See K.S.A. 60-404; *Baker*, 281 Kan. at 1002. During closing arguments, Gaither's trial counsel attacked Holloman's credibility by highlighting Holloman's failure to report the alleged aggravated robbery to police. We believe Gaither's counsel did not object to the evidence for strategic reasons and, thus, will not address the merits of the issue.

*Instruction for Prior Bad Acts*

Gaither next argues that the limiting instruction for the other crimes evidence did not restrict the consideration of the evidence to the attempted first-degree premeditated murder charge. Gaither claims that the district court committed reversible error by allowing the jury to consider Holloman's testimony for the remaining charges. However, Gaither did not object to the omission of this restriction in the instruction. Recently, we held that the failure to give a limiting instruction for evidence of other crimes or bad acts does not require automatic reversal. *Gunby*, 282 Kan. at 58. When the complaining party fails to request the instruction or object to its omission, the failure to give the instruction is reversible only if clearly erroneous. " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.' " *Gunby*, 282 Kan. at 58-59.

Gaither argues that the jury would not have found him guilty of killing Washington if it had been properly instructed regarding the use of the prior crimes evidence. We find no merit in Gaither's argument. The testimony from several witnesses overwhelmingly supports the jury's verdict on the felony-murder charge without requiring the jury to consider Holloman's testimony. There is not a real possibility that the jury would have rendered a different verdict. Thus, the district court's failure to restrict the consideration of Holloman's testimony to the attempted first-degree premeditated murder charge was not clearly erroneous.

*Lesser Included Instruction*

Gaither argues that the district court should have instructed the jury to consider aggravated battery as a lesser included crime for attempted first-degree premeditated murder. Gaither requested the instruction, so we consider the denial of his request in a light most favorable to him. See *State v. Oliver*, 280 Kan. 681, 703, 124 P.3d 493 (2005).

K.S.A. 2006 Supp. 21-3107(2) defines lesser included crimes as:

"(a) A lesser degree of the same crime;

(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;

(c) an attempt to commit the crime charged; or

(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)."

While acknowledging that aggravated battery is not a lesser included crime of attempted first-degree murder pursuant to K.S.A. 2006 Supp. 21-3107(2)(b), Gaither relies on K.S.A. 2006 Supp. 21-3107(2)(a), arguing that aggravated battery and attempted murder are the same crime and that aggravated battery is simply a lesser degree of attempted murder. See *State v. Daniels* 223 Kan. 266, 271-72, 573 P.2d 607 (1977) (holding that aggravated battery is not a lesser included crime of attempted first-degree murder under the elements test). According to Gaither, "the original impetus for both crimes stemmed from the same types of actions."

Gaither relies on *Andrews v. State*, 679 So. 2d 859 (Fla. Dist. App. 1996), and *People v. Lopez*, 245 Ill. App. 3d 41, 614 N.E.2d 329 (1993), for the proposition that other courts consider aggravated battery and attempted murder to be the same crime. However, neither case supports his proposition. In *Andrews*, the Florida Court of Appeals noted that aggravated battery is a permissive lesser-included offense for attempted first-degree murder but reversed the defendant's conviction because the trial court instructed on a version of aggravated battery that was not supported by the charging document. 679 So. 2d at 859. Similarly, the *Lopez* court summarily noted that aggravated battery is a lesser included offense of attempted first-degree murder but held that an instruction for aggravated battery was not warranted by the evidence. 245 Ill.

App. 3d at 47. Although both of these courts considered aggravated battery to be a lesser-included crime of attempted murder, these cases do not explain the analysis for that conclusion. Consequently, neither of these cases stand for the proposition that aggravated battery is the same crime as attempted first-degree murder.

Gaither fails to cite any other authority to support his proposition. A basic examination of the statutory definitions for first-degree murder and aggravated battery reveal a distinction between the two. First-degree murder involves killing and aggravated battery involves bodily harm. See K.S.A. 21-3401; K.S.A. 21-3414. Each crime is defined by the harm caused rather than the act performed. Because of this distinction, first-degree murder and aggravated battery are not the same crime. The definition for attempt relies on the definition of the underlying but uncompleted crime and requires a specific intent to commit the underlying crime. K.S.A. 2006 Supp. 21-3301. The attempt statute, however, does not alter the basic definition for the underlying crime. Thus, attempted first-degree murder is not converted into the same crime as aggravated battery merely by adding the attempt elements to the first-degree murder elements. Accordingly, aggravated battery does not qualify as a lesser-included crime of attempted first-degree murder under K.S.A. 2006 Supp. 21-3107(2)(a).

*Cumulative Errors*

Gaither claims that he was denied a fair trial because the district court committed cumulative errors that alone may have been harmless but, when viewed under the totality of the circumstances, prejudiced his trial.

An appellate court looks at the totality of the circumstances to determine whether cumulative errors have substantially prejudiced the defendant and denied his or her right to a fair trial. If the evidence against the defendant is overwhelming, no prejudicial error may be found under the cumulative effect rule. *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

Gaither relies on the other trial errors raised in this appeal to establish the cumulative errors. However, Gaither established only one error in the district court proceedings and the error did not

affect his substantial right to a fair trial. Accordingly, there is no reason to reverse Gaither's convictions based on cumulative trial errors.

*Sentence*

Gaither argues that the district court improperly relied on his criminal history score in determining his sentence because his criminal history had not been proven to a jury beyond a reasonable doubt. He acknowledges that this claim has been resolved against him but argues that the court should reconsider its prior decisions based on *Shepard v. United States*, 544 U.S. 13, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005). We have previously concluded that *Shepard* does not require the reversal of our prior decisions. *State v. Gonzalez*, 282 Kan. 73, 117-18, 145 P.3d 18 (2006). Thus, we find no merit in Gaither's argument.

Gaither's convictions and sentences are affirmed.