No. 104,847

STATE OF KANSAS, *Appellee*, v. JASON A. CRUZ, *Appellant*.

(307 P.3d 199)

Opinion filed August 9, 2013.

*Joanna Labastida*, of Kansas Appellate Defender Office, argued the cause, and *Shawn E. Minihan*, of the same office, was with her on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: The district court granted the State's motion to consolidate two homicide cases against Jason A. Cruz, one involving a murder in a nightclub parking lot in August 2008 and the other involving a murder in a strip club parking lot in March 2007. Following the consolidated jury trial, the jury convicted Cruz of first-degree murder and criminal possession of a firearm for the 2008 incident but acquitted him of the first-degree murder, aggravated battery, and criminal possession of a firearm charges arising from the 2007 incident. Cruz appeals his convictions for the 2008 murder, arguing: (1) The district court erroneously granted the State's motion to consolidate; (2) the district court unconstitutionally admitted improper eyewitness identification evidence; (3) the district court erroneously instructed the jury on eyewitness identification testimony; (4) the district court erroneously admitted gang evidence; and (5) the cumulative effect of trial errors denied him a fair trial. Finding that the errors in this proceeding did not deny Cruz his right to a fair trial, we affirm his convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to the charges in the 2008 case for which Cruz was convicted occurred in the early morning hours of August 24, 2008, in the parking lot of Lightning Joe's nightclub. The victim, Larry Barnett, had been in the nightclub with his fiancée, Elease Childers, Childers' aunt, and Childers' brother. At the 1:50 a.m. closing time, Barnett, Childers, and her aunt proceeded to leave the nightclub but noticed that Childers' brother was not with them. Barnett went back inside to find him and told Childers and her aunt to wait outside.

Meanwhile, Cruz was in the parking lot with Esquire McNair and Angela Smith, whose Ford Escape was parked in the lot. While Childers and her aunt were waiting, Cruz and McNair approached them. Childers' aunt and McNair were engaged in a friendly conversation when Barnett returned with Childers' brother and informed McNair that Childers was with him. Barnett and McNair shook hands, and the group began to disburse, when Cruz verbally challenged Barnett, prompting a few minutes of argument.

Cruz then went to Smith's vehicle and retrieved a large handgun, which Smith tried to take from him. But Cruz pushed Smith to the ground and walked toward Barnett and shot him in the leg. After Barnett fell to the ground, Cruz continued walking toward him until he was standing over Barnett. From that vantage point, Cruz discharged all the rounds remaining in the weapon, inflicting a total of 16 gunshot wounds into Barnett, which proved fatal. After the shooting ended, Cruz, McNair, and Smith got into the Escape and drove away.

At approximately 1:59 a.m., Wichita police received a 911 call reporting the shooting. When Officer Randy Williamson arrived at the scene, Childers was hysterical for several minutes before Williamson was able to calm her down and obtain a basic description of the suspects and the vehicle they were driving. Williamson broadcasted the descriptions over his police radio, causing another officer to stop a Ford Escape at approximately 2:10 a.m. Three people were in the vehicle; Smith was driving, Cruz was in the front passenger seat, and McNair was in the back seat.

Based upon Childers' assurances that she could identify the suspects, Williamson drove her to the location of the vehicle stop. When they arrived, several patrol cars were parked along the curb behind the Escape. The three suspects were each in a separate patrol car. Williamson parked approximately 50 feet away from the suspects and illuminated the area with his spotlight, takedown lights, and bright headlights. Childers sat in the rear of the patrol vehicle with the cage partition window open, allowing her a clear view through the front windshield. Officers brought the suspects out of the patrol cars individually for identification.

Cruz was the first person the police brought out for identification. As soon as Cruz looked toward the patrol vehicle, Childers unequivocally said, "[T]hat's the man that shot my fiancé." Next, Childers immediately identified McNair as the man who was originally arguing with Barnett. Childers also identified Smith as the female who was trying to break up the disturbance in the parking lot. Finally, Childers identified the Escape as the vehicle from which Cruz had obtained his handgun and in which he had fled after the shooting.

Smith gave the officers permission to search her Escape. A crime scene investigator searched the vehicle and found a Cobray M-11 9 millimeter pistol underneath the front passenger seat. The firearm, tool mark examiner for the Sedgwick County Regional Forensic Science Center testified that all of the recovered bullets from the Lightning Joe's incident came from the Cobray gun.

The Sedgwick County Regional Forensic Science Center Biology and DNA lab manager testified that she was only able to obtain a partial DNA profile from the weapon; however, Cruz could not be excluded as a contributor to the DNA profile. In statistical terms, the probability of selecting an unrelated individual at random who would exhibit a profile that is a potential contributor to the profile on the grips of the weapon is 1 in 112 in the Caucasian population, 1 in 209 in the black population, and 1 in 192 in the Hispanic population.

The State charged Cruz with first-degree murder and criminal possession of a firearm in the 2008 case. The first jury trial in the case resulted in a mistrial because the jury could not reach a unanimous verdict. Before Cruz was retried on that crime, the police obtained information from an informant, Raymond Hubbard, that connected Cruz to an earlier murder in the parking lot of the Babydolls strip club.

The Babydolls incident occurred in that establishment's parking lot in the early morning hours of March 8, 2007. Timothy Conde had gone to the club with his cousin and Jeff Johnson. Conde and Johnson left the club a little before 2 a.m. Before they reached their vehicle, a man approached them and acted as though he wanted to fight. Conde and Johnson told the man they were not bothering anyone and informed him that they were members of the Crips gang. That man walked away as though there was no further problem. But another unknown man approached, said, "[W]e about to jump some gangster shit now," and punched Conde. Conde tried to return the punch, but an unseen assailant shot him in the arm and fired other rounds that hit the ground near Conde as he ran towards his car. At 1:45 a.m., a detective was dispatched to Babydolls and found Johnson in the parking lot with six gunshot wounds. He was pronounced dead at 2:13 a.m. A crime

scene investigator recovered 10 cartridge casings and 7 bullets from the crime scene.

In August 2009, Hubbard contacted the police to relate that Cruz had committed the 2007 Babydolls murder, using the same gun that he used in the 2008 Lightning Joe's murder. Hubbard knew Cruz because they were both members of the Folk gang. He testified that the day after the Babydolls homicide, Cruz told Hubbard he shot a man several times and killed him. Hubbard did not go to the police at the time because as a gang member, he was "supposed to keep [his] mouth closed." Hubbard testified that Cruz told him about the connection between the two homicides while he and Cruz were in jail together. In exchange for testifying truthfully at Cruz' trial, Hubbard was given a plea agreement in his own case. The Babydolls case had been cold since the summer of 2007, but because of Hubbard's information, detectives asked the tool mark examiner to see if the Babydolls' and Lightning Joe's homicides were linked. The tool mark examiner confirmed that the same gun was used in both homicides. The State charged Cruz with first-degree murder, two counts of aggravated battery, and criminal possession of a firearm in the Babydolls case.

The State filed a motion to consolidate the two cases, and Cruz filed a written objection to the consolidation and orally objected at the hearing on the motion. Despite the objection, the district court granted consolidation. The consolidated case proceeded to a jury trial, and the State presented evidence about both homicides. The jury found Cruz guilty of both charges in the 2008 Lightning Joe's case but acquitted him on the charges in the 2007 Babydolls case. The district court imposed consecutive sentences of a hard 50 life sentence on the first-degree murder conviction and 23 months' imprisonment on the criminal possession of a firearm conviction. Cruz timely appeals his convictions.

## CONSOLIDATION

Cruz first contends that he was denied his right to a fair trial when the district court erroneously consolidated his two cases into one trial. A district court is statutorily permitted to order two or more cases to be tried together if the crimes involved could have

been joined in a single complaint, information, or indictment. K.S.A. 22-3203. Two or more crimes may be charged in separate counts of the same complaint, information, or indictment, if the crimes: (1) are of the same or similar character; or (2) are based on the same act or transaction; or (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. K.S.A. 22-3202(1). Cruz contends that, here, the district court erred in finding that the crimes involved in his two cases met the condition precedent of being of the same or similar character. We disagree.

*Standard of Review*

Analyzing a joinder issue can involve different levels of inquiry with different review standards:

"When analyzing an issue of joinder, an appellate court determines which of the three conditions precedent the district court relied on (same or similar character; same act or transaction; or two or more acts or transactions connected together or constituting parts of a common scheme or plan); whether there is substantial competent evidence to support the district court's findings of fact, using a deferential standard; whether the district court properly concluded that a condition precedent had been met, using a de novo standard; and whether the district court abused its discretion in allowing joinder." *State v. Gaither*, 283 Kan. 671, Syl. ¶ 4, 156 P.3d 602 (2007).

In this appeal, we do not discern any challenge to the district court's factual findings. Rather, Cruz argues that the legal conclusion should have been that the facts did not establish that the crimes were of the same or similar character, an issue over which we will exercise unlimited review.

Additionally, Cruz contends that the district court should have exercised its discretion to deny consolidation because of the extreme prejudice created by presenting the jury with evidence from both crimes. Obviously, our review of this contention is for an abuse of discretion, and, for this portion of the analysis, we would consider whether any reasonable person would have reached the same conclusion as the trial judge. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011) (delineating three aspects of abuse of discretion analysis), *cert. denied* 132 S. Ct. 1594 (2012).

*Analysis*

Cruz first challenges the district court's finding of the requisite condition precedent, which in this case was that the crimes were of the same or similar character. Cruz' brief recites the trial judge's explanation of its ruling, which we find most helpful to our review:

"This Court, of course, did preside over the trial involving the Lightning Joe's incident. The jury determined that they could not arrive at a verdict. There was a mistrial. That case is still pending. The [Babydolls] case does have very similar characteristics. It was an incident that occurred in the early morning hours after a bar closes down. The same firearm was used. Multiple shots were fired in both cases.

"The Court would also observe that with regard to the most recent case, that is, [the Babydolls case], there certainly is evidence from the Lightning Joe's case that would be admissible under 60-455, to wit, the identification of the defendant as being in possession of the gun and the identification of the gun, and with regard to that the two cases are similar and joined at the hip, so to speak, with regard to the firearm. You can't offer evidence with regard to a gun in the [Babydolls] case without admitting evidence that derives from the [Lightning Joe's] case, which certainly that evidence is admissible in both cases. They are of the same or similar character and, accordingly, the Court will order that for the purpose of proceeding forward on trial on both cases they will be consolidated for purposes of conducting a single trial and both charges will be submitted to the jury at that trial."

Moreover, substantial competent evidence established the following facts: Both crimes involved patrons leaving a nightclub at closing time; both victims were accosted and challenged in the establishment's parking lot before the patrons could reach their respective vehicles; both victims had scant warning before being shot repeatedly and killed with a handgun; the same weapon was used in both shootings and contained a small amount of DNA that did not exclude Cruz as a contributor; a fellow gang member identified Cruz as the shooter in both incidents; and both cases charged first-degree murder and criminal possession of a firearm. If that scenario does not establish two crimes of the same or similar nature, one would need a novelist's imagination to conjure up one that would.

The State points us to the similarities between the facts and nature of the charges here and those that were presented in *State v. Barksdale*, 266 Kan. 498, 510, 973 P.2d 165 (1999), where this

court found no abuse of discretion in the joinder of two murder counts for a consolidated trial. In *Barksdale*, both murders were unsolved for almost 2 years, until a jailhouse informant told police that Barksdale had confessed to both murders.

Barksdale argued on appeal that the murders were not similar because the first victim was the defendant's friend who had engaged in sex with his attacker, while the second victim was a stranger killed at the dry cleaning business where she worked and had not been sexually assaulted. In addition to arguing that the crimes were factually distinct, Barksdale also argued that the same evidence was not necessary in order to prove both crimes and that only one witness would testify about both cases. 266 Kan. at 508.

Rejecting Barksdale's arguments, this court concluded that the murders were sufficiently factually similar to warrant joinder because: (1) Robbery was the motive in both cases, (2) the manner of both killings was substantially similar, (3) both victims were found face down and tied with cords, and (4) both murders were committed in the same neighborhood within 9 months of one another. 266 Kan. at 508-09. *Barksdale* recognized that only one witness testified about both charges, but the court found that the cases required the same mode of trial, the same kind of evidence, and resulted in the same kind of punishment. 266 Kan. at 509.

Cruz offers three reasons that we should determine that his two crimes were not of the same or similar nature: (1) The crimes occurred 17 months apart; (2) only two witnesses had substantive evidence about both crimes; and (3) there would have been little burden to keep the trials separate. We discern that those circumstances do not really go to the character of the crimes committed as much as they might impact whether it was discreet or appropriate for the district court to try the similar crimes together. Nevertheless, the proffered reasons are unpersuasive.

The 17-month interval between crimes in this case pales in comparison to the 4 years that passed between the two murders in *State v. Cromwell*, 253 Kan. 495, 512, 856 P.2d 1299 (1993), where we found joinder appropriate. See also *State v. Bunyard*, 281 Kan. 392, 403, 133 P.3d 14 (2006) ("[T]he time span between all three incidents occurred within slightly over 1 year and, accordingly, the

time span is not significant for severance considerations."). Moreover, the mere passage of time does not change the fact that these crimes can be characterized as cold-blooded murders with the same illegally possessed handgun under strikingly similar circumstances.

The argument that only two witnesses had substantive evidence about both crimes minimizes the fact that the two common witnesses—Hubbard, the jailhouse informant, and Gary Miller, the tool mark examiner—were critically important to the proof of both crimes. Moreover, in both *Gaither* and *Barksdale*, this court upheld joinder notwithstanding that only *one* witness testified about both crimes in those cases. See *Gaither*, 283 Kan at 687; *Barksdale*, 266 Kan. at 509.

Finally, we reject Cruz' argument that a separate trial would present very little burden. A second jury would have to be called, selected, empanelled, and paid. Precious days on an overworked court's trial docket would be utilized for a second murder trial, at which the second jury would hear exactly the same testimony from Hubbard and Miller. Granted, the desire to reduce the burden on the court's budget or the desire to avoid duplication cannot trump the requirement that a criminal defendant receive a fair trial. But one certainly cannot characterize the cost of a separate murder trial to be *de minimis*.

Next, Cruz argues that, even if the condition precedent was met, the district court abused its discretion in granting consolidation. The burden is on Cruz to establish the abuse of discretion. See *Gaither*, 283 Kan. at 688; *Bunyard*, 281 Kan. at 403. He asserts that by consolidating the Babydolls case, the State made evidence of gang membership admissible, and that evidence, when coupled with the inherently harmful circumstance of being charged with two separate murders, unfairly influenced the jury. He claims the highly prejudicial effect of that evidence is borne out by his conviction on the 2008 murder, after the first jury could not reach a verdict.

The State counters that the jury was appropriately instructed that each crime charged was a separate and distinct offense and must be considered independently on the evidence and law appli-

cable to each charge. In *Gaither* and *Barksdale*, we rejected jury confusion arguments when the jurors were instructed to consider each charge " 'separately on the evidence and law applicable to it; uninfluenced by [their] decision as to any other charge.' " *Gaither*, 283 Kan. at 687; *Barksdale*, 266 Kan. at 510. Appellate courts have ascribed to the hypothetical presumption that such an instruction negates the inherently prejudicial effect of trying a person on multiple counts. See *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011); *Gaither*, 283 Kan. at 687.

But here, the notion that the jury was not unduly influenced by the gang membership evidence or the propensity inference to be drawn from two murder charges is supported by its verdicts. The jury acquitted Cruz of the three offenses charged in the Babydolls matter. Sometimes, we view acquittals as compelling evidence of a jury's ability to differentiate between charges joined for trial. See *Bunyard*, 281 Kan. at 402. Here, if the jury was to make an improper use of the gang evidence and the two murder charges with respect to the 2008 case, it would seem logical that it would have been similarly prejudiced with respect to the 2007 Babydolls case.

In short, Cruz has not met his burden of establishing that the district court abused its discretion in consolidating the two cases for trial, after finding that the crimes were of the same or similar character. Consequently, we affirm the district court's order of consolidation.

## SHOW-UP EYEWITNESS IDENTIFICATION

Cruz next argues that the district court violated his constitutional rights when it used an improper "drive-by" lineup to identify him as the perpetrator in the 2008 Lightning Joe's homicide. He argues that the procedure used was unnecessarily suggestive and created a substantial likelihood of misidentification.

### Standard of Review

We review a challenge to an eyewitness identification as a due process determination involving a mixed question of law and fact. We apply a substantial competent evidence standard when reviewing the factual underpinnings of a trial court's decision to admit or

suppress an eyewitness identification and apply a de novo standard to the ultimate legal conclusion drawn from those facts. *State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 (2006). Cruz argues that because material facts are not in dispute, our review is de novo; however, the district court made numerous factual findings in its ruling on the motion to suppress, and Cruz' argument focuses on the factual circumstances underlying the identification. We, therefore, proceed under our established mixed question of law and fact standard of review.

*Analysis*

Recently, we discussed the two-step process district courts follow in determining whether an eyewitness identification is admissible evidence:

"The first step examines whether the police procedure used to obtain the identification was impermissibly or unnecessarily suggestive. If so, trial courts move to the second step and consider whether there was a substantial likelihood of misidentification under the totality of the circumstances surrounding it." *State v. Mitchell*, 294 Kan. 469, 476, 275 P.3d 905 (2012) (citing *Corbett*, 281 Kan. at 304).

Before looking at whether the procedure the police employed here was "unnecessarily suggestive," we acknowledge an issue that we raised but did not decide in *Mitchell*. There, we discussed our appellate courts' prior interchangeable use of the terms "unnecessarily," "impermissibly," and "unduly" suggestive to describe the first step of the process:

"We pause to note that the panel supported its holding on the photo lineup issue by citing *State v. Corbett*, 281 Kan. 294, 304-05, 130 P.3d 1179 (2006), which uses the term 'impermissibly suggestive' in describing the standard for reviewing police eyewitness identification procedures. But see *State v. Reed*, 45 Kan. App. 2d 372, 379, 247 P.3d 1074, *rev. denied* 292 Kan. 968 (2011) (noting Kansas appellate courts frequently use the terms 'unnecessarily suggestive' and 'impermissibly suggestive' interchangeably and suggesting the term 'unnecessarily suggestive' more accurately describes the *Corbett* standard). The Court of Appeals in Mitchell's case used yet another term: unduly suggestive. This, at the least, hints strongly that uniformity in the terminology may be needed. But the photo lineup issue is not before this court, so that opportunity must wait." *Mitchell*, 294 Kan. at 473.

Perhaps, given no evidence that there has been any conceptual confusion about how to perform the first step of the analysis, one might perceive that it is unnecessary to engage in an extended discussion of the most appropriate word to use to describe "suggestive," which is the truly operative word in these cases. Indeed, it appears that most Kansas appellate decisions addressing the eyewitness identification issue have made no conscious distinction among the terms but rather have used them interchangeably. Nevertheless, given that the door has been opened, we will walk through it.

In concluding that "unnecessarily suggestive" most accurately describes the standard under the first step of the process, the *Reed* panel opined:

"Although we believe a literal interpretation of the term 'impermissibly suggestive' is a conclusive finding about the legality of the procedure, the *Corbett* court uses this standard of suggestiveness as only the beginning of its inquiry, not its end. Specifically, the *Corbett* test requires such a finding before the analysis can proceed to the second step for a determination regarding whether the 'impermissibly suggestive' procedure was reliable in light of the totality of the circumstances. See 281 Kan. at 304-06.

"Significantly, use of 'unnecessarily suggestive' as a standard appears to derive from the analysis conducted by appellate courts in Kansas that recognize time is often crucial when there is an eyewitness who can identify a suspect and delay in identification could impede the police investigation. *State v. Alires,* 246 Kan. 635, 640, 792 P.2d 1019 (1990) (citing *State v. Meeks,* 205 Kan. 261, 266, 469 P.2d 302 [1970]). A literal interpretation of the term 'unnecessarily suggestive' is consistent with this analysis, which requires the court to decide whether exigent circumstances necessitated the more suggestive procedure as opposed to use of an alternative procedure that was less suggestive. Notably, a finding that less suggestive procedures could have been used does not render the more suggestive procedure unreliable as a matter of law. Such a finding means only that the court is obliged to move on to the second part of the analysis. See *Corbett,* 281 Kan. at 304." *State v. Reed,* 45 Kan. App. 2d 372, 379-80, 247 P.3d 1074, *rev. denied* 292 Kan. 968 (2011).

A review of the *Alires* opinion cited in *Reed* supports the Court of Appeals' reasoning that exigent circumstances can necessitate a more suggestive lineup procedure. *State v. Alires,* 246 Kan. 635, 640, 792 P.2d 1019 (1990). Ironically, though, *Alires* also utilizes all three terms, "impermissibly suggestive," "unnecessarily sugges-

tive," and "unduly suggestive," interchangeably. 246 Kan. at 639-41.

But we are not alone in ruminating on these matters. Recently, Justice Sotomayor recognized that the United States Supreme Court has likewise used the terms " 'impermissibly,' " " 'unnecessarily,' " and " 'unduly' " suggestive interchangeably. *Perry v. New Hampshire,* ___ U.S. ___, 132 S. Ct. 716, 733 n.3, 181 L. Ed. 2d 694 (2012) (Sotomayor, J., dissenting). Justice Sotomayor found that the interchangeable use of the terms "reinforce[s] our focus not on the act of suggestion, but on whether the suggestiveness rises to such a level that it undermines reliability." 132 S. Ct. at 733 n.3 (Sotomayor, J., dissenting). The *Perry* majority did not address Justice Sotomayor's discussion of the terms; however, the majority used the term "unnecessarily suggestive" when not quoting prior decisions. 132 S. Ct. at 724-26.

We conclude this interlude by adopting the term "unnecessarily suggestive" for use in the first step of the eyewitness identification analysis, based upon its literal meaning and its most recent use by our highest court. We do not perceive, however, that this clarification will meaningfully impact the substantive analysis in this area of the law.

Turning to the analysis, we would characterize the procedure employed here as falling within the conduct commonly referred to as a one-person show-up identification, which is essentially one person, almost always in custody, sometimes in handcuffs, being identified "by an individual who usually was the victim of a crime a short time before the identification." *State v. Hunt,* 275 Kan. 811, 815, 69 P.3d 571 (2003); see also *Alires,* 246 Kan. at 636, 640-41 (discussing show-up identification caselaw even though witness was driven by two suspects on side of road); *State v. Lawson,* 25 Kan. App. 2d 138, 142, 959 P.2d 923 (1998) (refusing to distinguish between one-person and two-person show-up lineups). Specifically, Officer Williamson took Childers to the location where Smith's Escape had been stopped and brought the suspects into her view, one at a time, for her to identify. Cruz was in handcuffs.

The district court found that the identification procedure used in this case was not "impermissibly suggestive." The court did note

that the fact that Childers had been told that a car had been stopped with people who may have been involved might be suggestive. But the court ultimately opined:

"Focusing on the facts of this case, the three individuals were brought out one by one, individually, within a 50 foot distance from the witness. There was no conversation from Officer Williamson or any of the others that in any way provided any clues or hints as to any of the identifications. Officer Williamson himself had no knowledge of the order in which the three people were going to be brought out."

We find no fault with the district court's determination that Officer Williamson conducted the "one-person show-up" identification in as fair a manner as was possible. The problem lies with the procedure itself. As our United States Supreme Court said in *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967): "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." In *Stovall*, the defendant was brought to the witness' hospital room in handcuffs and surrounded by police officers; he was the only African-American in the room. Although the Court did not explicitly find the procedure to be unnecessarily suggestive, it would later describe the *Stovall* one-person show up to be "undeniably suggestive." See *Perry*, 132 S. Ct. at 724.

The State argues that the show-up identification was not unnecessarily suggestive because we have previously "approved one-on-one confrontations shortly after the commission of an offense, recognizing that time is crucial when there is an eyewitness who can identify a suspect and that any delay in identification could impede the police investigation." *Alires*, 246 Kan. at 640. That argument collapses the two steps of our analysis. *Alires* allowed the identification to stand because the show up did not violate due process under the totality of circumstances in that case. 246 Kan. at 641. The United States Supreme Court in *Stovall* recognized that exigent circumstances can necessitate an undeniably suggestive show-up identification where the totality of the circumstances indicate the absence of a due process violation. There, police did not know if the hospitalized witness would live and it was impossible for the witness to go to the jail. *Stovall* held that the police, faced with the

responsibility of identifying the attacker and the need for immediate action, undertook the only procedure possible. *Stovall*, 388 U.S. at 302. Recent Kansas cases have been decided on the second step, *i.e.*, have found the procedure to be unnecessarily suggestive under the first step. See, *e.g.*, *Hunt*, 275 Kan. at 816-17 (unnecessarily suggestive identification analyzed on second step); *see also Reed*, 45 Kan. App. 2d at 381 (finding procedure unnecessarily suggestive when police escorted robbery victim to identify suspect in back seat of patrol car); *State v. Maybin*, 27 Kan. App. 2d 189, 203, 2 P.3d 179 (noting that court might conclude that identification procedure used by police was unduly suggestive but proceeding to second step of analysis), *rev. denied* 269 Kan. 938 (2000); *Lawson*, 25 Kan. App. 2d at 142 (finding procedure unnecessarily suggestive where store clerk who had been robbed identified defendant who was escorted from police car wearing handcuffs). But see *State v. Galyardt*, 44 Kan. App. 2d 729, 735, 240 P.3d 619 (2010) (finding that it was not unnecessarily suggestive for police to drive witness to location where burglary suspect was stopped and not arrested), *rev. denied* 294 Kan. 945 (2012).

Under the facts of this case, we conclude that the procedure used by the police was unnecessarily suggestive. Williamson told Childers that the police had stopped a vehicle whose occupants might be involved in her fiancé's murder. Williamson drove Childers to the scene of the stop where Cruz was individually paraded in front of Williamson's patrol car in handcuffs and spotlighted for Childers to identify. It would be difficult for a witness to miss the suggestion in that scenario. Moreover, the State does not explain what "exigent circumstances" existed that "necessitated the more suggestive procedure as opposed to use of an alternative procedure that was less suggestive." *Reed*, 45 Kan. App. 2d at 379; *cf. Stovall*, 388 U.S. at 302 (necessity for suggestive procedure found where witness hospitalized and unable to go to jail for lineup and police not certain that witness would survive). The State does not claim, nor do we find on our own, that the show-up identification was necessary to provide law enforcement with probable cause to arrest Cruz.

But when the police use an unnecessarily suggestive procedure, "suppression of the resulting identification is not the inevitable consequence." *Perry*, 132 S. Ct. at 724; see also *Corbett*, 281 Kan. at 304-05. "[T]he second step requires an analysis of whether the [unnecessarily] suggestive procedure led to a substantial likelihood of misidentification." 281 Kan. at 304. The critical element is the reliability of the identification. 281 Kan. at 305. "If the identification bears some indicia of reliability and there is not a substantial likelihood of irreparable misidentification, the jury must decide whether the evidence is reliable enough to support the defendant's conviction." 281 Kan. at 305 (citing *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 [1977]).

Under that second step, we consider the totality of the circumstances surrounding the identification, looking particularly at a number of specific factors which include such things as the witness' opportunity to view the criminal during the incident, the accuracy of the witness' first description, the time elapsed between the incident and the later identification, and the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. *Cf. Mitchell*, 294 Kan. at 478 (citing *Corbett*, 281 Kan. at 305). Here, Cruz concedes that Childers had the opportunity to view Cruz during the event. In fact, at the suppression hearing, Officer Williamson testified that when he arrived at Lightning Joe's, he approached Childers and her aunt because they had blood on them which had indicated to him that those witnesses had been close to the scene of the shooting.

Perhaps more important than Childers' proximity to Cruz was the fact that she was able to observe him throughout the entire encounter. Initially, the contact was nonconfrontational, allowing her to see Cruz through a lens unclouded by adrenaline-rushed fear or panic. Then, she was present during the verbal argument between McNair and Barnett, which could well serve to heighten one's focus. She saw Cruz go to the Escape and return with a gun; she watched Smith unsuccessfully attempt to stop Cruz from joining the fight with the gun; she saw that Cruz was pointing the gun at Barnett but having problems getting the gun to fire as he was walking towards Barnett; she observed the first shot from 15 to 20

feet away and continued to watch Cruz as he shot the fallen Barnett from above; and, finally, she was able to accurately describe how Cruz, Smith, and McNair ran to the Escape and left the nightclub parking lot.

The district court also found that Childers was not only able to identify Cruz, but she was able to describe the context and role the other two individuals with Cruz played in the confrontation leading to the shooting; that Childers did not hesitate or equivocate in identifying Cruz; that the identification took place "within moments, if not an hour"; and that while Childers was initially upset, she calmed down as time progressed and there was no indication that Childers was still suffering from an emotional state that would cause her to misidentify a suspect at the time she went to the location of the vehicle stop. We find that the district court's findings were supported by substantial competent evidence, and we will not reweigh that evidence on appeal.

Furthermore, we need to remain cognizant that Cruz' argument that Childers' identification testimony was influenced by the procedure employed to obtain her initial identification is, fundamentally, a challenge to the weight of that evidence. Under ordinary circumstances, a defendant can challenge the weight that should be attributed to a witness' identification through " 'vigorous cross-examination and persuasive argument by defense counsel dealing realistically with the shortcomings and trouble spots of the identification process.' " *Corbett*, 281 Kan. at 306 (quoting *State v. Warren*, 230 Kan. 385, 395, 635 P.2d 1236 [1981]). Here, Cruz took full advantage of his opportunity to vigorously cross-examine Childers. Considering the totality of the circumstances, we conclude that Childers' identification bore indicia of reliability and did not create a substantial likelihood of irreparable misidentification; therefore, the district court did not err in *allowing the jury to decide* whether the evidence was believable. See *Mitchell*, 294 Kan. 469, Syl. ¶ 1 (once district court determines eyewitness identification is admissible evidence, jury decides whether it is reliable enough to support defendant's conviction). In other words, the district court did not violate Cruz' right to due process by admitting Childers' identification evidence.

EYEWITNESS IDENTIFICATION JURY INSTRUCTION

Cruz argues that the district court erred in instructing the jury on eyewitness identification with PIK Crim. 3d 52.20, because that pattern instruction at the time directed the jury to consider the degree of certainty demonstrated by a witness as a factor in deciding the accuracy of the identification. We agree that "[j]urors should not be instructed that the degree of certainty expressed by the witness at the time of an identification of the defendant is a factor they should weigh when evaluating the reliability of that eyewitness identification testimony." *Mitchell*, 294 Kan. 469, Syl. ¶ 4. But we find that Cruz has not carried his burden to convince us that the instructional error was clearly erroneous under the facts of this case.

*Standard of Review*

Cruz did not object to the eyewitness identification jury instruction that was given by the district court. Therefore, our standard of review is governed by K.S.A. 22-3414(3) and *State v. Williams*, 295 Kan. 506, 511, 286 P.3d 195 (2012). In *Williams*, we recognized that K.S.A. 22-3414(3) creates a procedural hurdle for a party that fails to object to or request a jury instruction:

"K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court." 295 Kan. 506, Syl. ¶ 3.

The determination of whether an instruction is clearly erroneous employs a two-step process. First, "the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." 295 Kan. 506, Syl. ¶ 4. If error is found, then we proceed to the second step of assessing whether we are firmly "convinced that the jury would have reached a dif-

ferent verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." 295 Kan. 506, Syl. ¶ 5; see also *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013).

*Analysis*

The instruction under attack in this appeal was taken from PIK Crim. 3d 52.20 and recited as follows:

"The law places the burden upon the State to identify Mr. Cruz. The law does not require Mr. Cruz to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

3. Whether the witness had observed the defendant on earlier occasions;

4. Whether a significant amount of time elapsed between the crime charged and any later identification;

5. Whether the witness ever failed to identify the defendant or made any inconsistent identification;

6. *The degree of certainty demonstrated by the witness at the time of any identification of the accused*; and

7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." (Emphasis added.) See PIK Crim. 3d 52.20.

Cruz complains that the instruction should not have included the sixth factor—the witness' degree of certainty. Subsequent to the filing of briefs in this case, this court discussed the degree of certainty factor in three opinions, albeit neither party has filed a Supreme Court Rule 6.09(b) (2012 Kan. Ct. R. Annot. 49), letter of additional authority addressing these cases. See *Mitchell*, 294 Kan. 469, *State v. Anderson*, 294 Kan. 450, 276 P.3d 200 (2012), and *State v. Marshall*, 294 Kan. 850, 281 P.3d 1112 (2012).

In *Mitchell*, we reaffirmed that a trial court is required to issue a cautionary instruction when an eyewitness' identification testimony is critical to the prosecution's case but disapproved the degree of certainty factor in such a jury instruction. See 294 Kan. at 478-82. Under *Mitchell*'s holding, a trial court errs by instructing the jury on the reliability of eyewitness identification by using PIK Crim. 3d 52.20 without omitting the degree of certainty factor. *Marshall*, 294 Kan. at 867. Although this point was not settled at the time of Cruz' trial and Cruz did not object to the giving of PIK Crim. 3d 52.20 without modification, the same reasons that existed for finding error in *Mitchell, Anderson,* and *Marshall* apply in this case. Therefore, we hold that the district court erred in including the degree of certainty factor when instructing Cruz' jury on eyewitness identification. See *Marshall*, 294 Kan. at 867.

Because there was error, this court must next determine whether the error requires reversal of Cruz' convictions. See *Williams*, 295 Kan. 506, Syl. ¶ 1. Because he did not object at trial, Cruz faces the high burden of convincing us that the inclusion of the degree of certainty factor in the eyewitness identification cautionary instruction was clearly erroneous, *i.e.*, that we are firmly convinced that the jury would have reached a different verdict had the instruction not included the erroneous language. See 295 Kan. 506, Syl. ¶ 5.

In *Marshall*, like here, the clearly erroneous standard applied. Nevertheless, *Marshall* began with the same initial inquiries utilized in the harmless error analysis in *Mitchell* and *Anderson*, to-wit: (1) Was the identification crucial to the State's case? and (2) Was there an opinion of certainty stated? *Marshall*, 294 Kan. at 867-68. Here, just as in *Marshall*, we find that the answer to both questions is "yes."

With respect to the first question, the shooter's identity was the main issue the State needed to prove; Childers' eyewitness testimony was the most concrete evidence establishing that fact; and both sides acknowledged in closing arguments that the shooter's identity was the disputed issue for the jury to decide. Childers' identification was not the only evidence in the State's case, but it was critically important, if not crucial. On the second inquiry, there

was certainty evidence submitted to the jury. Officer Williamson testified that when Childers identified Cruz at the scene, she did not hesitate or qualify her remarks in any way. Childers told the jury that she was "a hundred percent positive" that Cruz was the man who killed her fiancé.

An affirmative answer to both of those two questions simply means that our inquiry has not ended, as it would with a "no" response to either query. See *Marshall*, 294 Kan. at 868 (negative answer to either question ends analysis because jury could not have been misled by degree of certainty factor in instruction). The next step is to "consider the impact of the jury instruction in light of the entire record and additional considerations." 294 Kan. at 868. *Marshall* concluded that other procedural safeguards mitigated the instruction error and that other evidence linked Marshall to the crime so that the instruction error was not clearly erroneous. 294 Kan. at 869-70.

The other procedural safeguards present in *Marshall* included a rigorous cross-examination of the identifying witness and a closing argument that "methodically reminded the jury of all the inconsistencies." 294 Kan. at 869. The same was true here. Defense counsel cross-examined Childers about inconsistencies in her testimony. In closing argument, defense counsel discussed factors that detracted from the reliability of the identification. The defense was able to use Childers' degree of certainty against her by pointing out that, in addition to being positive that Cruz was the shooter, she had said that she was positive that Cruz was in the back seat of the vehicle, when other evidence contradicted that testimony. Defense counsel argued to the jury: "The degree of certainty demonstrated. Yep, she says that 100 percent, just like she's 100 percent or just like she's positive that [Cruz] gets into the back seat." Defense counsel also pointed out that other witnesses taken to the car stop were unable to identify Cruz as the shooter. Defense counsel further reminded the jury of the beyond a reasonable doubt standard of review and argued that the evidence did not meet this standard.

Likewise, as in *Marshall*, although Childers' identification of Cruz was the strongest evidence linking Cruz to the crime, it was

not the only evidence. The State established that Cruz had been at Lightning Joe's on the night in question; that Smith saw Cruz with a gun during the fight that led to Barnett's death; that the gun used in the homicide was found underneath the Escape's passenger seat where Cruz was riding approximately 9 minutes after the shooting; that Cruz could not be excluded as a contributor to the DNA profile on the gun; that the same gun was used in both homicides; and that Hubbard testified that Cruz confessed to using the same gun in both homicides. Consequently, we are *not* firmly convinced that, if the eyewitness identification cautionary instruction had not included the direction to consider degree of certainty in determining the reliability of the identification, the jury would have reached a different verdict, *i.e.*, declined to convict him. Therefore, the instruction error was not clearly erroneous.

## GANG AFFILIATION EVIDENCE

Cruz next complains that the State presented the gang evidence for no other reason than to place him in a bad light. Therefore, he contends, the trial court erred in admitting the gang evidence. We disagree.

### Standard of Review

In *State v. Peppers*, 294 Kan. 377, 386-87, 276 P.3d 148 (2012), we noted that the admissibility of gang affiliation evidence is subject to different standards of review, depending upon the precise issue that is in play:

"Gang affiliation evidence is admissible if relevant. [Citations omitted.] Relevant evidence is defined by statute as evidence that is both material and probative. K.S.A. 60-401(b). We review whether evidence is material under a de novo standard. [Citation omitted.] Materiality addresses whether ' "a fact . . . has a legitimate and effective bearing on the decision of the case and is in dispute.' " *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008) (quoting *State v. Garcia*, 285 Kan. 1, 14, 169 P.3d 1069 [2007]). In other words, a fact is material if it is ' "significant under the substantive law of the case and properly at issue.' " *Reid*, 286 Kan. at 505 (quoting [*State v.*] *Goodson*, 281 Kan. 913, 922, 135 P.3d 1116 [2006]). We review whether evidence is probative under an abuse of discretion standard. [Citation omitted.] Evidence is probative if it has ' "any tendency in reason to prove any material fact." ' *State v. Houston*, 289 Kan. 252, 261, 213 P.3d 728 (2009) (quoting K.S.A. 60-401[b]). 'For evidence of gang affiliation to be

admissible there must be sufficient proof that gang membership or activity is related to the crime charged.' *State v. Tatum*, 281 Kan. 1098, Syl. ¶ 3, 135 P.3d 1088 (2006). Even if evidence is deemed relevant, it may be excluded if it is more prejudicial than probative. [Citation omitted.] We review a district judge's weighing of prejudice and probative value for an abuse of discretion. [Citation omitted.]"

*Analysis*

At trial, the prosecutor questioned Hubbard about his relationship with Cruz through their common gang membership. Cruz objected and was granted a continuing objection; therefore, this issue has been preserved for appeal. See *State v. Goodson*, 281 Kan. 913, 920, 135 P.3d 1116 (2006).

Hubbard testified that he and Cruz grew up in the same neighborhood and both joined the Folk gang. Over the years, the two men and their families socialized together. Hubbard related that Cruz told him about the Babydolls homicide the day after it happened but that he had not gone to the police at that time because as a gang member, he was supposed to "keep [his] mouth closed."

In 2009, while Hubbard and Cruz were both in the same jail pod, Cruz told Hubbard he used the same gun in both the 2008 Lightning Joe's murder and the 2007 Babydolls murder, expressing concern that the police would discover this connection. Hubbard then informed the police that Cruz committed the Babydolls murder and told them to trace the gun. In exchange for testifying truthfully at Cruz' trial, Hubbard was granted a plea arrangement in his own case.

Cruz argues that prior appellate cases have limited the admissibility of gang evidence to cases involving certain circumstances. See, *e.g.*, *Goodson*, 281 Kan. at 922 ("[G]ang evidence may be material and, therefore, relevant when the evidence provides a motive for an otherwise inexplicable act, forms a part of the events surrounding the commission of the crime, or shows witness bias."). As this court recently clarified in *Peppers*, however, "gang evidence need not fall into specific categories that happened to arise in previous cases in order to be relevant and admissible." 294 Kan. at 390. *Peppers* further explained: "Although certain of our earlier cases on gang evidence arose in particular circumstances, a list of those circumstances does not exhaust the possibilities when gang

evidence is relevant and permissible." 294 Kan. at 389. *Peppers* was decided after the briefs were filed in this case, and neither party has filed a Rule 6.09(b) letter of additional authority address-ing it.

The State urges us to find that the district court was correct in finding that the portion of Hubbard's testimony that connected Cruz to his gang was relevant to Hubbard's credibility. Specifically, the gang affiliation evidence could explain why Cruz would trust Hubbard with such sensitive information and why Hubbard would preserve Cruz' initial secret about the Babydolls incident for 29 months. Further, the gravity of betraying a fellow gang member puts Hubbard's decision to come forward in a different context than the ordinary jailhouse snitch.

Cruz argues that the act of confessing crimes to another is not practiced exclusively among gang members; defendants also con-fess crimes to friends, family, other inmates, or even the police. But, as Hubbard suggested, gangs often have a code of silence that makes confessing to a gang affiliate much less risky than sharing secrets with outsiders. In that context, the gang affiliation evidence in this case was germane to the question of whether Cruz shared his secret with Hubbard.

In a different context, we have held that evidence of bias re-sulting from gang membership is admissible. *State v. Ross*, 280 Kan. 878, 886, 127 P.3d 249 (2006) (quoting *State v. Knighten*, 260 Kan. 47, 54, 917 P.2d 1324 [1996]) (" ' "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testi-mony." ' "). See also *Knighten*, 260 Kan. at 54 (discussing *United States v. Abel*, 469 U.S. 45, 49, 105 S. Ct. 465, 83 L. Ed. 2d 450 [1984], and finding that "[t]he probative value of evidence of gang membership as it pertains to witness bias is high"). Here, the gang affiliation evidence was used to bolster Hubbard's testimony, rather than to impeach him as biased.

Although not cited by Cruz, 4 months after *Ross*, we found that when the testifying gang member is implicating the defendant, rather than protecting him, the evidence is not admissible as evi-

dence of bias. *Goodson*, 281 Kan. at 923. In *Goodson*, the defendant and Thomas attacked and robbed two people who were walking down the street. During the robbery, one of the victims was stabbed to death. Thomas entered into a plea for his role in the crime and testified against the defendant at his trial. The State introduced evidence of the defendant and Thomas' gang affiliation to establish the relationship between the two men. We recognized the precedent of allowing evidence of gang membership to show a relationship between witnesses; however, we found that when the gang member is testifying against the defendant and the questions are not framed in a manner to reveal bias or loyalty, the evidence is not relevant to prove a material fact. 281 Kan. at 923-24.

*Goodson* is distinguishable because the witness in that case was testifying from first-hand knowledge as an admitted participant in the crime, *i.e.*, it was a classic situation of one codefendant cutting a deal at the expense of another codefendant. The evidence of gang membership added nothing to the scenario. Moreover, it was unlikely that the jury would think that a witness would make up testimony that would result in that witness also being convicted of a crime, *i.e.*, evidence of gang membership was unnecessary to make the witness' testimony more believable. Here, in contrast, Hubbard's testimony that Cruz confessed to him was not a statement against Hubbard's interest. To the contrary, the testimony had no down side for Hubbard. Instead, the testimony begged the question of why Cruz would choose to confess to Hubbard, a question that defense counsel asked on cross-examination. In short, the credibility of Hubbard's testimony that Cruz confessed to the crimes was a materially disputed fact in this case, and the gang affiliation evidence was relevant to that issue. The district court did not err in admitting the evidence.

## CUMULATIVE ERROR

Cruz finally argues that even if no individual trial error is sufficient to support a reversal of his convictions, the cumulative effect of multiple errors was so great as to require reversal. The test is " 'whether the totality of circumstances substantially prejudiced the

defendant and denied the defendant a fair trial. No prejudicial error may be found under this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' " *State v. Edwards,* 291 Kan. 532, 553, 243 P.3d 683 (2010) (quoting *State v. Ellmaker,* 289 Kan. 1132, Syl. ¶ 12, 221 P.3d 1105 [2009]).

*Standard of Review*

By necessity, if this court must apply a totality of the circumstances test, we must review the entire record and engage in an unlimited review. *Cf. State v. Ward,* 292 Kan. 541, Syl. ¶ 8, 256 P.3d 801 (2011) (harmless error analysis performed de novo), *cert. denied* 132 S. Ct. 1594 (2012).

*Analysis*

For errors to have a cumulative effect that transcends the effect of the individual errors, there must have been more than one individual error. *State v. Backus,* 295 Kan. 1003, 1017, 287 P.3d 894 (2012). Above, we found that the district court erred by instructing the jury to consider the degree of certainty as a factor for determining the accuracy of the eyewitness identification testimony. We also found that the police used an unnecessarily suggestive procedure to identify Cruz, albeit we held that Childers' identification bore indicia of reliability and did not create a substantial likelihood of irreparable misidentification. Arguably, then, more than one error exists which could be accumulated.

We recognize that a cumulative error analysis is to some degree subjective. See *Edwards,* 291 Kan. at 553. Moreover, in this instance, the errors give us pause because they were related to the same ultimate issue of the reliability of Childers' eyewitness identification of Cruz. But the same reasons that led us to find that the individual errors were not reversible lead us to be firmly convinced beyond a reasonable doubt that the result of this trial would have been no different without the errors.

There was inculpatory evidence other than Childers' eyewitness identification establishing that Cruz was at the scene of the 2008 Lightning Joe's murder holding a gun; that the gun used in the 2008 homicide was found underneath the Escape's passenger seat where Cruz was riding approximately 9 minutes after the shooting;

that Cruz could not be excluded as a contributor to the DNA profile on the gun; that the same gun was used in both homicides; and that Hubbard testified that Cruz confessed to using the same gun in both homicides. Moreover, as we discussed above, the circumstances of Childers' observation of Cruz provided indicia of reliability mitigating the unnecessarily suggestive procedure employed.

As we have recognized for decades, "[a] defendant is entitled to a *fair* trial but not a perfect one, for there are no perfect trials." *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 (1974). Although a close call, the totality of the circumstances convince us that Cruz was not denied his right to a fair trial.

Affirmed.