NOT DESIGNATED FOR PUBLICATION

Nos. 117,423
117,424

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CURTIS A. SMITH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed December 21, 2018. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., PIERRON, J., and BURGESS, S.J.

PER CURIAM: A jury convicted Curtis A. Smith of aggravated kidnapping, rape, aggravated battery, three counts of criminal threat, criminal damage to property, and violation of a protection order. The district court sentenced Smith to a total of 911 months of incarceration and ordered each sentence to run consecutively. Smith appeals. We affirm.

Smith met D.S. on the dating website Plenty of Fish in the spring of 2015. For their first date, D.S. picked Smith up at his grandmother's house. He took a large bag with

him. They went to her apartment to hang out with her adult son and some friends. After the rest of the company had left, Smith asked to shower there. Smith spent that night at D.S.'s apartment and when she asked him to leave, he asked to stay a couple days because he had just returned to Wichita and was trying to figure out living arrangements. At first, they were good friends, but eventually they became involved in a romantic relationship.

As time went on, D.S. asked Smith a few times about his living arrangements and he always replied that he was working on it. Things began going downhill the longer Smith stayed. He took control of her car, money, and phone. He also became verbally abusive, calling her names and threatening to burn her alive and pimp her out on Back Page. D.S. testified, "Oh, everything was Back Page, everything was burn me alive, everything was I'm gonna check your temperature when you get home," which meant he was going to beat her. Smith was "always drunk" and grabbed D.S. several times. One time, she refused to go to the liquor store for him and he grabbed her and flung her on the bed. He told her, "You're lucky I'm not gonna go full fledge." It was easier for D.S. to surrender and do as he asked than to continue the fight. D.S. also reported incidents of nonconsensual sex, times in which Smith proceeded to have intercourse with her without her consent. This included one time when she verbalized she did not want to have sex and "he just went ahead and did it."

In reference to the escalation of behaviors, D.S. testified, "I guess I let it happen, I got scared. I lived in fear, every day. I was sick to come home, I didn't want to come home from work, you know." She continued asking Smith to leave, but he refused. When her son, T.G., was about to be discharged from the military, she asked him to return to Wichita to help her.

T.G. moved in on October 2, 2015. Initially, Smith treated D.S. well, but as time went on, T.G. saw more of his bad behaviors surface. He testified: "Her mobile devices were all basically on lock, she wasn't allowed to leave the house really as much, always

2

questioning when she did anything, where she was going, what she was doing, the time, just every little thing was monitored, micromanaged." Smith threatened to burn T.G. and D.S. with gasoline while they were sleeping. T.G. did not intervene when Smith was verbally abusive out of fear that the conflict would become physical.

D.S.'s employer participated in domestic violence awareness in the month of October. While D.S. was in a training class at work, Smith sent her threatening texts that she shared with her class. A supervisor later pulled her out of class to talk about getting help. D.S. hesitated because she did not want the situation to get worse.

Shortly thereafter, Smith and D.S. were arguing about her not going to buy him more alcohol. Smith punched D.S. then pinned her against the wall by her throat. T.G. ran in and told Smith "if he ever touched my mother again, I'll kill you."

Two days later, the human resources director from D.S.'s job took her to the district court to obtain a protection from abuse (PFA) order. She testified that she did not include everything that had happened in her application for the PFA order, because,

> "at the time I was scatter-brained, I was just in a rush and I put the basic in there to be able to get this approved, as I was on work time and . . . I needed the money so I had to hurry up and get right back to work."

D.S. stated she did not want any issues; she just wanted him to take his things and leave.

After work, T.G. took D.S. to the Wichita Police Department. She gave the officers her house key and the paperwork to serve Smith. Officer Katherine Goebel went with another officer to D.S.'s apartment at approximately 8 p.m. on October 21, 2015. Smith was under the influence of alcohol and argumentative when she served him. He took about 15 to 20 minutes to gather his things. He called S.R. to pick him up.

3

S.R., had known Smith since she was 14. She took Smith to her house so he could make some calls. Smith acted like he did not know why D.S. had obtained a PFA and he denied all her allegations. He messaged some people on Facebook and when he had not been able to get a hold of anybody, he asked to stay the night. S.R. agreed to let him stay that night only. The next day, she took him to a few places to help him find a place to stay, but she realized he was just trying to buy marijuana.

After they returned to S.R.'s house, Smith became upset and blamed S.R. for ruining his life. She offered to talk to D.S. and see if they could work things out. Smith grabbed her by the back of her neck and shoved her, telling her, "you ain't makin' nothin' better, in fact, you're gonna put your shoes on, you're gonna go beat her ass. I can at least get some enjoyment out of all of this." When she refused, he choked her, pinning her against her dresser for 5 or 6 seconds. As he held her by the throat, he told S.R. that he was not going anywhere now that he finally had her. S.R. stated she did not call police because she knew it would only get worse if she did. Plus, Smith had taken her phone and would not give it back.

Every day, S.R. drove Smith to D.S.'s apartment complex. He claimed he needed to get money from somebody who owed him. On October 27, 2015, as she drove through the lot, Smith, who had a glass full of liquor, "flipped out", and spilled the alcohol on the floorboard and on himself. She tried handing him something to wipe off with, but he had gotten out of the car and was cussing at her. He broke the rain guard off her passenger window and threw it straight through the car, grazing S.R.'s eye. He walked around to the driver's side, reached through the open window, and slammed S.R.'s head against the side of the vehicle. Smith said something like "you need to park your little ass over there or leave" and so she left. As she drove off, her vision started getting "fuzzy" so she pulled into a parking lot to check her eye and find her phone. When she looked up, Smith was walking toward the vehicle and he looked angry. He grabbed her head again and

4

slammed it against the side of the vehicle. He told her she needed to start listening and know her role. Smith got back into the passenger seat and told her to go home. S.R. told Smith he had to leave. He agreed to get his things and find somewhere else to stay.

On the way home, she pulled in behind a police car and tried to stay close. She told Smith that it might have been best to call police and have an officer present at the house to make sure everything went smoothly. Smith did not want police involved and she knew something bad was going to happen. S.R. then drove into the Wendy's parking lot and tried to go inside. He grabbed her by the arm and forced her back into the car. He told her to calm down and just go home. He assured her there would be no problems.

When they arrived at S.R.'s home, she asked him to stay in the car. As she unlocked the door, Smith flung the door open, shoved her into the house, took her keys, and slammed the door behind them. S.R. threatened to call 911, but Smith would not allow it. He smacked the phone out of her hand and every time she tried to leave, he grabbed her by the hair to keep her in the house. Then Smith began beating her. He knocked her to the floor and punched her repeatedly on the side of her head. S.R. testified:

> "He's standing over me, just whaling on me. My face was like the main part, my head and my face and my throat were the main parts that he was going after, it was just blow after blow after blow to my head, my face, punching me over and over again, choking me until that went on for I couldn't tell you how long. I begged for him to stop and – he wasn't having it. And I was like, something is seriously wrong, please stop, like, I need medical attention now, like something is really, really wrong. And he was like – just wouldn't stop, he just kept just blow after blow . . .".

At one point, Smith grabbed S.R. by the throat with one hand as he punched her with the other. He choked her to the point she could not breathe and she lost consciousness. When she woke up, she was on the floor and confused. Her head was

5

throbbing, her eyes were swelling, and her nose hurt. When she went to the bathroom to see the damage, Smith followed behind her. She asked him why he was doing that to her and he told her "you just don't know when to stop, you need to shut your fuckin' mouth . . . you'll learn your role." She sat on the couch and asked him for medical treatment. He told her that neither of them were leaving.

S.R. asked Smith to take her to her mother's house. He grabbed her from behind, threw her on the couch, and began beating her again. He choked her again to the point she lost consciousness. When she awoke, Smith continued beating her until she lost consciousness again. S.R. stated that although the violence lasted only minutes, it felt like hours.

When Smith stopped, S.R. begged him for hours to let her get medical treatment or at least go to her mother's house. Smith refused because he knew the police would get involved. At one point, he professed his love for her, admitting that he had been in love with her for years. He told her, "now that he had [S.R.], he wasn't letting [her] go."

Smith wanted her to go to her bedroom, but she was afraid of what might happen if she did. She finally went, hoping that Smith would fall asleep and she could escape. She put her body pillow between them and turned her back to him. As she laid on the bed, she cried, thinking she was dying. He continued telling her how much he loved her and said, "oh, my God, I wanna make love to you so bad right now." While he removed her clothing, she cried and repeatedly begged him, "don't do this." He shushed her and told her it would be okay and that he loved her. She never consented to having sex with Smith. After all that had occurred that evening, she did not have the strength to fight him off. Smith penetrated her vagina with his penis. After he ejaculated, he got up and got a washcloth to clean her up.

The next morning, Smith still refused to allow her to seek medical treatment, repeating that neither of them were going anywhere. He insisted that he loved her and he would never let her go. He was going to nurse her back to health so he could feel better about what he had done. Smith told S.R. that he was going to kill D.S. and he needed a small blunt object.

S.R. was finally able to run out of the house. She ran to the next block, but her eyes were so swollen she could not see. Smith drove up in her car and agreed to take her to her mother's house. He dropped her off and told her she better be ready in 45 minutes. Her mother called the police and took her to the hospital.

After Smith dropped off S.R., he sideswiped Pheasant Weber's vehicle as she was waiting to turn, damaging her back bumper and wheel. Repairs cost $3,500. Smith continued driving after he struck Weber's vehicle and she followed while she called 911. Smith got out of S.R.'s vehicle and attempted to open Weber's driver's side door and when he could not, he hit her window and windshield. By the time police arrived, Smith was gone.

That evening, T.G. was home with D.S. and a friend. He heard loud music coming from a vehicle in front of the apartment. T.G. saw Smith in the car. Smith pointed his fingers like a gun toward T.G. and the apartment. T.G. yelled to D.S. to call 911 because he perceived the gun-like gesture as a threat. Smith drove away but returned and drove into the parking lot—getting closer to the apartment and looking up at their balcony. Three police vehicles entered the lot. Smith drove around the parking lot and crashed S.R.'s vehicle before running on foot. Police tased Smith and arrested him.

On November 2, 2015, the State charged Smith with aggravated kidnapping, rape, two counts of aggravated battery, violation of a protective order, two counts of criminal threat, and criminal damage to property in case number 15CR3128 for the incidents that

7

occurred after Smith was removed from D.S.'s house on October 21, 2015. Police did not learn of Smith's criminal behaviors toward D.S. until she spoke with a detective at the preliminary hearing. Because the information became available at the preliminary hearing, rather than amending the charges, the State filed a second case against Smith for the incidents that occurred while he was living with D.S. On December 28, 2015, the State filed case number 15CR3717, alleging Smith committed aggravated battery, two counts of criminal threat, and cruelty to animals.

On October 14, 2016, the State moved to consolidate the two cases or, in the alternative, to admit evidence of prior crimes or bad acts under K.S.A. 2017 Supp. 60-455. The State contended that all of the offenses were of the same general character as Smith "controlled [his victims], beat them, choked them, forcefully had sex with them, threatened to kill them, refused to let them leave their homes, and when they asked him to leave he became violent with them." The State also asserted that the crimes were based on two or more transactions constituting parts of a common scheme or plan, as permitted for joinder under K.S.A. 22-3202(1).

Smith argued against consolidation because the acts were separate acts with different victims at separate times. He contended the State was attempting to use the behaviors in one case as evidence of Smith's propensity to commit the offenses in the other case.

The district court granted the State's motion for consolidation, finding that the offenses were very similar in nature. The court noted that under K.S.A. 2017 Supp. 60-455(c) and (d), the Kansas Legislature opened the door to evidence of prior sex offenses when a defendant is charged with a sex offense. Such evidence can be considered for its bearing on any other matter to which it is relevant or probative. The court noted that with domestic violence and rape allegations, the evidence deals with the relationship as well. Not only can the victims testify to prior occurrences to show the relationship of the

8

parties, but anyone else can testify to acts perpetrated against them under K.S.A. 2017 Supp. 60-455(d). The court reasoned that if the permissible 60-455 evidence were presented in one case, and evidence of the other case was presented to the jurors, who then used that information in deciding the verdict, the State might be presented with a double jeopardy issue.

The district court conducted a five-day jury trial with the above facts. After the lunch break on the second day of trial, Juror 12 reported she had been in the elevator with some of the State's witnesses. Juror 12 said she heard somebody say, "shh, shh, shh, don't say anything, be quiet." She reported the incident because it made her a little nervous and she wanted to make sure she had not done anything wrong. Neither the State nor Smith expressed any concern for Juror 12 remaining on the jury.

In the morning on the third day of trial, the district court called Juror 12 in because after jurors had been released the previous day, she told the court's aide that she had some anxiety or fear that the victims or the victims' families were going to follow her home or there would be some problems. The State requested removal based on that statement alone. Juror 12 stated:

> "Well, we all park in the same parking garage, I guess I was just feeling uncomfortable yesterday with that so. I'm okay now . . . . It's nothing . . . there was nothing said . . . I guess it was just as I get older things bother me more, that didn't bother me before. So I'm okay."

The district court expressed an overriding concern that, as a deciding juror, Juror 12 might not decide only on the evidence, uninfluenced by any personal experiences, biases, personal views or any other factor. The State questioned Juror 12:

"[State]: Do you still feel that if I prove this case beyond a reasonable doubt, not what your verdict would be or where you're leaning, that you could enter an appropriate verdict of guilt if the case is proven to you beyond a reasonable doubt?

"[Juror 12]: If all the evidence and everything from everything, could I make an accurate decision, is that what you're –

"[State]: If it's proven.

"[Juror 12]: Is that what the question is?

"[State]: The question, just like we asked before, before in jury selection, if you are convinced beyond a reasonable doubt of the defendant's guilt can you follow the law and vote guilty?

"[Juror 12]: Yes, I can do what I need to do with everything presented, I can do what I need to do once everything is laid on the table and all of us discussing the decision, yes."

Smith asked if the victims took any actions, made any looks or did anything that made Juror 12 concerned. She stated the victim looked straight at her when the victim took the stand but testified that none of these things would affect her ability to be fair to the State and Smith. Before taking the issue under advisement, the district court noted that even though Juror 12 ultimately answered the questions correctly, it remained concerned that she hesitated before answering whether she could enter a guilty verdict if the State proved Smith's guilt beyond a reasonable doubt. The court further expressed concern that her answer was indirect and her concerns were irrational.

The following morning, the State proffered the information provided by the victim witness coordinator who was escorting the witnesses in the elevator when Juror 12 rode in the elevator with them. The coordinator stated that before entering the elevator, she told the witnesses to be quiet but nobody said, "oh, shit, oh, shit, oh, shit" as reported by Juror 12. The coordinator contended that nobody spoke a word in the elevator.

The district court expressed significant concerns about Juror 12's ability to be a fair judge in the case. It noted her perception of what happened in the elevator did not match that of the coordinator. The court found it concerning that she was susceptible to

10

misperceiving things as threatening or intimidating when that was not the reality. The court expressed further concern that Juror 12 had no basis for her fear of the victim, as she never indicated she felt like the victims were following her around or that they made comments to her. The court pointed out that witnesses are supposed to look at the jurors and tell them their story. The court noted that when the State specifically asked about Juror 12's ability to render a guilty verdict, she hesitated both times "for an extended period of time and some awkward silence. And then her response was evasive, something to the effect that she'll look at the evidence and you know, based on that render a verdict." As a result, the court removed Juror 12 and sat an alternate juror.

The jury found Smith guilty of criminal threat to D.S. and T.G., criminal threat to D.S., aggravated kidnapping, rape, aggravated battery against S.R., violation of a protection order, criminal threat to T.G., and criminal damage to property. The district court sentenced Smith to the high box number for each crime of conviction, with each sentence to run consecutively. Smith's total sentence for both cases was 899 months in the custody of the Kansas Department of Corrections and 12 months in county jail with lifetime postrelease supervision.

Smith appeals.

*Jury Nullification*

Smith contends the district court undermined the jury's inherent right of jury nullification by instructing the jurors to consider lesser included offenses sequentially rather than simultaneously with the greater offenses and by instructing the jurors that they "must" follow the law and that it was their "duty" to do so.

During the jury instruction conference, Smith stated that the instructions were the result of consultation and informal meetings between counsel and the district court. The

11

instructions complied with requests he made and he had no objection to the jury instructions as prepared.

When analyzing jury instruction issues, an appellate court follows a three-step process. First, we must determine whether we can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). If a party fails to object to an instruction, we evaluate whether the instruction was a clear error. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). Because Smith failed to preserve the issue, the court can review the issue, but the analysis of the next two steps is altered to reflect the failure to preserve.

Second, we consider whether the instructions were legally and factually appropriate, using an unlimited review of the entire record. *McLinn*, 307 Kan. at 318. If the instructions were legally and factually appropriate, no error exists.

Finally, we must assess whether the error requires reversal. 307 Kan. at 318. Smith's failure to preserve the jury instruction issue affects our reversibility inquiry in the third step. K.S.A. 2017 Supp. 22-3414(3). We apply a clear error standard and will only reverse the district court if an error occurred and we are firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred. The party claiming error has the burden to demonstrate the necessary prejudice. 307 Kan. at 318.

Smith argues the district court impermissibly prohibited the jury from exercising jury nullification, essentially challenging the legal appropriateness of the instructions. Jury nullification occurs when the jury deliberately rejects the evidence or refuses to apply the law to either send a message about a social issue or because the legal results are contrary to the jurors' sense of justice, morality, or fairness. *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167 (2008). "[C]riminal defendants are not entitled to have the

jury instructed on jury nullification, but the jurors in a criminal case have the clear ability to disregard both the rules of law and the evidence in order to acquit a defendant. [Citation omitted]." 38 Kan. App. 2d at 890.

First, Smith challenges the sequential consideration of the lesser included offenses, contending that the offenses should be considered simultaneously. The district court prefaced each lesser included offense instruction with "If you do not agree that the defendant is guilty of [the greater offense] you should then consider the lesser included offense of [lesser offense]." Then, he challenges the instructions as containing mandatory language, disallowing the jurors to disregard the rules of law and exercise the right of nullification. The district court instructed the jury: "[I]t is your duty to consider and follow all of the instructions" and "[y]our verdict must be founded entirely upon the evidence admitted and the law as given in these instructions."

Sequential consideration of lesser included offenses is legally appropriate. Under K.S.A. 2017 Supp. 22-3414(3), in cases in which some evidence would reasonably justify a conviction of a lesser included crime, the district court shall instruct the jury as to the crime charged and any lesser included crimes. The Kansas Supreme Court has held sequential consideration of lesser included offenses in descending order of severity promotes an orderly method for consideration. *State v. Parker*, 301 Kan. 556, 561, 344 P.3d 363 (2015) (citing *State v. Trujillo*, 225 Kan. 320, 324, 590 P.2d 1027 [1979]). In *Trujillo*, the Supreme Court wrote, "As a matter of practice a trial court should instruct on lesser included offenses in the order of severity beginning with the offense with the most severe penalty." 225 Kan. at 324.

In *Parker*, the Supreme Court rejected the assertion that "if you cannot agree that the defendant is guilty" coerced the jury into returning a guilty verdict for the more severe charge. 301 Kan. at 562 (citing *State v. Korbel*, 231 Kan. 657, 661, 647 P.2d 1301 [1982]).

13

"The words, 'if you cannot agree' when used to preface an instruction on a lesser charge are not coercive and do not require the members of a jury to unanimously find the accused innocent of the greater charge before proceeding to consider a lesser charge. The words 'if you cannot agree' presuppose less than a unanimous decision and no inference arises that an acquittal of the greater charge is required before considering the lesser." 231 Kan. at 661.

Therefore, instructing the jurors to consider the lesser included offenses sequentially in descending order of severity is legally appropriate. The district court did not prevent the jury from exercising its right of jury nullification.

Smith next contends the district court erred and prohibited the jurors from exercising jury nullification by instructing them that it was their "duty to consider and follow all of the instructions" and their "verdict must be founded entirely upon the evidence admitted and the law as given in these instructions." He argues that by telling the jurors they must base their determination on evidence and law provided, the court basically told them they cannot use their sympathies and notions of right and wrong, as required for jury nullification.

The instructions given in this case mirrored the Pattern Instructions for Kansas. PIK Crim. 4th 51.010 (2017 Supp.) and PIK Crim. 4th 68.010 (2012 Supp.) Using the PIK instructions is not mandatory, but is strongly recommended because they have been developed by a knowledgeable committee to bring about accuracy, clarity, and uniformity in jury instructions. *State v. Allen*, 52 Kan. App. 2d 729, 733-34, 372 P.3d 432 (2016) *rev. denied* 306 Kan. 1320 (2017). In *State v. McClanahan*, 212 Kan. 208, 216, 510 P.2d 153 (1973), the court wrote, "The jury must be directed to apply the rules of law to the evidence even though it must do so in the face of public outcry and indignation." In *State v. Naputi*, 293 Kan. 55, 66-67, 260 P.3d 86 (2011), the court wrote, "It is not the role of the jury to rewrite clearly intended legislation, nor is it the role of the courts to

14

instruct the jury that it may ignore the rule of law, no matter how draconian it might be." Directing jurors to base their verdict on admitted evidence and the law as instructed coincides with the jurors' oath. K.S.A. 2017 Supp. 60-247.

Smith also asserts that in *State v. Smith-Parker*, 301 Kan. 132, Syl. ¶ 6, 340 P.3d 485 (2014), the court found that a jury instruction telling the jury it "must" or "will" enter a verdict is too close to directing a verdict for the State. The statement, when removed from its context, appears to be a broad rule covering all jury instructions. But the issue in *Smith-Parker* was not a matter of using "must" or "will" anywhere in the jury instructions, it was with regard to the burden of proof instruction where use of such language prevented the jury from making any other determination. The jury instruction in question read, "If you do not have a reasonable doubt from all the evidence that the State has proven [charged offense or lesser included offenses], then you *will* enter a verdict of guilty." 301 Kan. at 163. The court held that instructing jurors to enter a guilty verdict was akin to directing a verdict for the State. However, PIK Crim. 4th 51.010 (2017 Supp.), which the district court here read to the jurors, reads, "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty." Kansas courts have consistently found the use of "should" "'does not upset the balance between encouraging jury nullification and forbidding it . . . . [U]nlike the words must, shall, and will, the word should does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path.' [Citation omitted.]" *Allen*, 52 Kan. App. 2d at 735. Here, the instructions the district court provided to the jury were legally appropriate. The court did not prevent the jurors from exercising their right of jury nullification.

Because the jury instructions were legally and factually appropriate, no error exists. We need not analyze reversibility.

15

*Dismissal of Juror 12*

Smith further contends the district court erred in dismissing Juror 12 because the court lacked reasonable cause and she testified that she could be fair and impartial. Smith acknowledges that if we determine the district court abused its discretion, he has the burden of showing that his substantial rights were prejudiced. However, Smith asserts that because he claims a statutory error, the State, as the party benefitting from the error, should persuade the court that there was no reasonable probability that the error affected the trial's outcome in light of the entire record.

We review a district court's decision to discharge a juror and substitute an alternate juror under an abuse of discretion standard. *State v. Hilt*, 307 Kan. 112, 121, 406 P.3d 905 (2017). The defendant bears the burden of showing an abuse of discretion. 307 Kan. at 121. A judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Davisson*, 303 Kan. 1062, 1065, 370 P.3d 423 (2016).

K.S.A. 2017 Supp. 22-3412(c), in part, reads:

"A trial judge may empanel one or more alternate or additional jurors whenever, in the judge's discretion, the judge believes it advisable to have such jurors available to replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable to perform their duties."

It is not an abuse of discretion to replace a dismissed juror with an alternate where reasonable cause exists. *Hilt*, 307 Kan. at 121-22. The defendant carries the burden of establishing substantial prejudice before an appellate court will find that the district court abused its discretion. *State v. Martinez*, 288 Kan. 443, 446, 204 P.3d 601 (2009).

16

Smith does not specify whether he was challenging the district court's discretion as arbitrary, fanciful, or unreasonable; based on error of fact; or based on error of law. He recites the facts of the case and concludes that because Juror 12 testified that she could remain fair and impartial and the interaction in the elevator would not influence her deliberations, the court had no basis for her removal. Because Smith argues that the court's findings were contrary to Juror 12's testimony, he seems to be challenging the district court's determination as arbitrary, fanciful, or unreasonable. A district court acts arbitrarily, fancifully, or unreasonably when it adopts a view that no reasonable person would adopt. *Davisson*, 303 Kan. at 1065.

Smith argues the district court lacked reasonable cause to dismiss Juror 12 because she testified that the elevator encounter would not have affected her ability to fulfill her duties as a juror. But, despite what she said, the court had "significant concerns" about Juror 12's ability to be a fair judge in the case. The court was concerned about her perception of what happened in the elevator. She told the court's aide that somebody in the elevator said, "oh, shit, oh, shit, oh, shit." However, the victim advocate recounted that before she and the witnesses entered the elevator, she told the witnesses to be quiet and nobody spoke a word in the elevator. The court noted that this "raises concerns about [Juror 12's] perception or just that she appears to be very susceptible to misperceiving things as intimidating or threatening or uncomfortable, when that's not the reality."

The district court further addressed its concern that Juror 12 might tend to develop unreasonable fears. Specifically, she was afraid that the victims or their families would follow her home. The court noted that there was no basis for this fear, considering the victims had never followed her around or made comments to her. Her only reason had been that everybody parked in the same parking garage and she lived in the same part of Sedgwick County as the victims.

17

Additionally, Juror 12 feared one of the victims because she had looked at Juror 12 when the victim took the stand. The court noted that the victim did exactly what she was supposed to because witnesses testify to the jurors. The court was concerned that Juror 12 was susceptible to fears that are not associated with facts and are not reasonable. Though the fears were specific to the victim, the court stated, "this raises a whole bunch of concerns, one, is she gonna start thinking this about the defendant. Well, he looked at me or I'm afraid he's gonna follow me . . . I'm gonna find him guilty . . . because I'm fearful of him." The court noted that even if she remained fearful of only the victim, her fear could influence her to render a guilty finding, contrary to evidence, to prevent the victims from going after her.

The district court noted that both times she was specifically asked whether she could render a guilty verdict if the State met its burden of proof, the juror hesitated "for an extended period of time and some awkward silence." And when she answered, her response was evasive. The court cited *United States v. Blitch*, 622 F.3d 658, 667 (7th Cir. 2010) (citing *Skilling v. United States*, 561 U.S. 358, 386, 130 S. Ct. 2896, 177 L. Ed. 2d 619 [2010]), stating, the district court appraises the "juror's inflection, sincerity, demeanor, candor, body language and apprehension of duty." With that, the district court stated, "In looking at her behavior, her demeanor, her facial expressions, her tone, the way she responded, all of that, are things I take into consideration, as well. . . . And I'm going to dismiss [Juror 12]."

In *Skilling*, the United States Supreme Court explained:

"Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record – among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the

18

trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." 561 U.S. at 386-87.

In *Skilling*, the Court reviews the measures the district court took to ensure against prejudice in the jury and notes several times that the district court did not just take potential jurors' at their word, but explored the issues further. 561 U.S. at 394-95. The Court emphasized the importance of the district court's face-to-face questioning, which provided the opportunity to gauge the demeanor and credibility of the jurors. 561 U.S. at 395.

Here, while several of the district court's concerns are apparent from the transcripts, the court also described some of the factors it considered that we cannot glean from the record. The district court's observations along with testimony presented supports its conclusion that despite Juror 12's claim of impartiality, concerns of her ability to fulfill her duties as a juror remained. The district court did not err in dismissing Juror 12.

Even if we determined the removal of Juror 12 was in error, before we will find the district court abused its discretion, Smith must establish substantial prejudice. However, he asserts he should not have to prove substantial prejudice, instead, we should apply the harmless error standard. In which case, the State, as the party benefitting from the district court's determination, would have to prove the error did not affect the outcome of the trial. His argument fails because it is well established that the defendant bears the burden of demonstrating substantial prejudice. *Martinez*, 288 Kan. at 446. We are duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Smith provided no indication the Supreme Court is departing from this standard. Therefore, he has failed to establish his burden that the dismissal of Juror 12 prejudiced him. The district court did not err.

19

*Consolidation of Cases 15CR3128 and 15CR2717*

Next, Smith contends the consolidation of the two cases against him was highly prejudicial and permitted the State to paint Smith as a repeat offender although the cases involved separate acts, separate victims, and occurred at different times.

The appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the court determines whether K.S.A. 22-3202 permits joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint: (1) the charges must be of the "same or similar character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the district court's factual findings for substantial competent evidence and the legal conclusions de novo. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017).

Second, because K.S.A. 22-3202(1) provides that "charges 'may' be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion." *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. K.S.A. 2017 Supp. 60-261. *State v. Hurd*, 298 Kan. at 561.

Smith contends that although the crimes were similar in that they could both fall under the general domestic violence category, the underlying facts were markedly different. He noted that in *Smith-Parker*, the Supreme Court held that crimes are not automatically of the same or similar character simply because they are similar to each other. 301 Kan. at 157-58. Smith argues that the high level of violence involved in the crimes against S.R. prevent consolidation for the charges in the two cases.

In his brief, Smith does not appear to challenge the district court's factual findings, but challenges only the court's legal conclusion. The Kansas Supreme Court has previously found joinder appropriate when the offenses in separate complaints are "'of the same general character, require the same mode of trial and the same kind of evidence, and occur in the same jurisdiction.'" *State v. Ritz*, 305 Kan. at 962 (quoting *State v. Crawford*, 255 Kan. 47, 53, 872 P.2d 293 [1994]). The Supreme Court warned against relying solely on generalities when considering joinder as joinder would not be appropriate when "'there would inevitably be some jumbling of the two cases at the trial, which would tend to prevent that concentrated consideration of each case which is indispensable in matters of such gravity.'" 305 Kan. at 963 (quoting *State v. Barksdale*, 266 Kan. 498, 508, 973 P.2d 165 [1999]). The Kansas Supreme Court specifically analyzed the "'same or similar character'" condition of joinder, noting that earlier Kansas cases required multiple commonalities, not merely similar classification of charges. 305 Kan. at 963 (quoting *Smith-Parker*, 301 Kan. at 157.)

Here, the two cases both involve criminal threat and aggravated battery. Smith contends the two separate situations are analogous to those in *Smith-Parker*, in which the district court erred in consolidating Smith-Parker's two murder charges. In one homicide, Smith-Parker targeted the victim in a burglary to steal drugs and the other homicide was the result of an argument between two good friends. Smith argues that like the offense in *Smith-Parker*, his offenses were only relatable in that they fell into the category of domestic violence. He asserts the level of violence involved in the two cases disallow

21

consolidation. The State alleged that he violently beat and choked S.R. to the point she lost consciousness, raped her, and she sustained injuries to her neck, chin, and eyes; whereas, the State only alleged he slapped D.S. The crimes against S.R. included aggravated kidnapping, a level 1 person felony; rape, a level 1 person felony; and aggravated battery, a level 4 person felony. However, the crimes against D.S. included aggravated battery, a level 7 person felony and two counts of criminal threat, level 9 person felonies. He claims the district court failed to look at the facts of each situation and so erred in consolidating the cases.

However, Smith's case appears to be more analogous to the offenses in *Ritz*, in which the State charged Ritz with multiple offenses stemming from two incidents that both included fleeing or attempting to elude an officer, theft, and driving while a habitual violator. In *Ritz*, the district court found that in both situations, Ritz fled because he panicked when police approached him and his flight took place in residential neighborhoods. Both incidents resulted with Ritz crashing. The district court additionally found the cases required the same mode of trial and would result in the same punishment. The significant difference between the two separate incidents was that in the second, Ritz collided with another vehicle, killing the driver. The State charged Ritz with first-degree felony murder. Despite the disparity between the severity of charges, the court recognized the similarity of facts leading up to the murder that were sufficiently similar to warrant consolidation.

Here, Smith operated similarly in both situations. He asked to stay with the victims while he figured out his living arrangements, controlled their access to their cell phones quickly, and controlled their use of their cars. In both situations, his victims asked him repeatedly to leave but he refused and threatened them with violence if they called the police. In both situations, Smith began by grabbing and shoving the victims, grabbing them around the throat without squeezing, while pinning them and leaving them unable to move. Smith became verbally abusive very quickly, calling the women names and

22

threatening them with further violence if they did not comply. With both victims, he insisted that because he had them he would not let them go. Smith operated the same in taking control over the women's lives and forcing them to comply out of fear. Also, D.S. obtained the PFA and had Smith removed from her residence two days after he punched her. He went straight to S.R.'s residence and became violent toward her the following day. The incidents of violence were mere days apart.

Although there was a significant difference in the level of violence, there was a significant factor that may have played a role—support from others. Even with T.G.'s presence, Smith continued his abusive behaviors. But when he punched D.S., T.G. ran to her rescue and they developed a plan to get Smith out of their lives. D.S. obtained the PFA because her coworkers expressed concern and assisted her in getting to the courthouse to file the application. Even though she did not have access to her phone or car, she had access to others who helped her. However, S.R. did not have anybody in her home to help her. She did not have access to her phone and could not reach out to anybody without Smith monitoring. The difference in the level of violence is not sufficient to disallow consolidation. If anything, it shows a continuation of behaviors in an environment he could control even more. The district court did not err in consolidating the cases as they were of the same or similar character.

A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The burden of demonstrating error is on the party alleging the abuse. *State v. Burnett*, 300 Kan. 419, 449, 329 P.3d 1169 (2014).

As the district court noted, had D.S. informed the police of Smith's offenses against her prior to the preliminary hearing for 15CR3128, the State would have charged all offenses in a single complaint. The only reason the State charged the acts separately

23

was because the parties were prepared and witnesses were present to move forward with the preliminary hearing for the offenses charged in 15CR3128.

Additionally, as the district court pointed out, because one of the criminal threat charges in 15CR3128 and the violation of the PFA both stem from the offenses charged in 15CR3717, if the court had not consolidated the cases, the State likely would have presented evidence in either trial that would have presented a double jeopardy issue in the second trial. Under K.S.A. 2017 Supp. 21-5110(b)(1) [formerly K.S.A. 21-3108(2)(a)], subsequent prosecution of an uncharged crime is barred if "'(1) The prior prosecution must have resulted in either a conviction or an acquittal; (2) evidence of the present crime must have been introduced in the prior prosecution; and (3) the present crime must be one which could have been charged as an additional count in the prior case.' [Citations omitted.]" *State v. Jordan*, 303 Kan. 1017, 1020, 370 P.3d 417 (2016).

Smith contends the prejudicial impact of the domestic violence against D.S. could only be used to show that Smith was a serial abuser, leading the jury to convict him on one because of the evidence of both. Kansas courts have rejected arguments that jurors use evidence of one to prove the other when jurors have been instructed to consider each charge separately on the evidence and law applicable to it. *State v. Cruz*, 297 Kan. 1048, 1058, 307 P.3d 199 (2013). The district court here provided the jurors with such an instruction. "Appellate courts have ascribed to the hypothetical presumption that such an instruction negates the inherently prejudicial effect of trying a person on multiple counts." *Cruz*, 297 Kan. at 1058 (citing *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 [2011]; *State v. Gaither*, 283 Kan. 671, 687, 156 P.3d 602 [2007]).

The jury found Smith guilty of eight offenses and not guilty of four offenses. Logically, if the jury improperly used the evidence of one offense as evidence of the other, the jury would have convicted Smith of the aggravated battery against D.S. and both counts of aggravated battery against S.R. However, the jury only found Smith guilty

24

of the more severe aggravated battery against S.R. The jury found him not guilty of aggravated battery by strangulation against S.R. and the charged aggravated battery against D.S. Smith has failed to meet his burden of establishing that the district court abused its discretion in consolidating the two cases for trial.

*Cumulative Error*

The test here is whether the totality of the circumstances establishes that the cumulative errors substantially prejudiced the defendant and denied him a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). See *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016).

We will find no cumulative error when the record fails to support the errors defendant raises on appeal. *Marshall*, 303 Kan. at 451.

Smith contends that the errors raised on appeal in this case built on each other to prejudice him and deny him a fair trial. However, the district court did not err in any of the issues raised. Therefore, Smith has failed to show that he is entitled to relief.

Affirmed.